**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WILLIAM C. BOND,
                    *Plaintiff-Appellant,*

v.

KENNETH BLUM, SR.; KENNETH BLUM,
JR.; DUDLEY F. B. HODGSON;
MCDANIEL, BENNETT & GRIFFIN;
ADELBERG, RUDOW, DORF &
HENDLER, LLC; CHRISTOPHER W.
NICHOLSON; WILLIAM SLAVIN,
                    *Defendants-Appellees.*

No. 02-1139

WILLIAM C. BOND,
                    *Plaintiff-Appellee,*

v.

ADELBERG, RUDOW, DORF &
HENDLER, LLC,
                    *Defendant-Appellant,*

and

KENNETH BLUM, SR.; KENNETH BLUM,
JR.; DUDLEY F. B. HODGSON;
MCDANIEL, BENNETT & GRIFFIN,
                    *Defendants.*

No. 02-1219

WILLIAM C. BOND,
                    *Plaintiff-Appellant,*

                         v.

ADELBERG, RUDOW, DORF &
HENDLER, LLC,
                    *Defendant-Appellee,*                    No. 02-1231
                        and

KENNETH BLUM, SR.; KENNETH BLUM,
JR.; DUDLEY F. B. HODGSON;
MCDANIEL, BENNETT & GRIFFIN,
                         *Defendants.*


WILLIAM C. BOND,
                    *Plaintiff-Appellee,*

                         v.

MCDANIEL, BENNETT & GRIFFIN,
                    *Defendant-Appellant,*
                        and                                  No. 02-1288

ADELBERG, RUDOW, DORF &
HENDLER, LLC; KENNETH BLUM, SR.;
KENNETH BLUM, JR.; DUDLEY F. B.
HODGSON,
                         *Defendants.*


Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-01-2600-MJG)


Argued: October 31, 2002

Decided: January 24, 2003

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

---

Affirmed in part and vacated and remanded in part by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams and Judge Michael joined.

---

## COUNSEL

**ARGUED:** Howard J. Schulman, SCHULMAN & KAUFMAN, L.L.C., Baltimore, Maryland, for Appellant. William Fitts Ryan, Jr., WHITEFORD, TAYLOR & PRESTON, L.L.P., Baltimore, Maryland; Andrew Radding, ADELBERG, RUDOW, DORF & HENDLER, L.L.C., Baltimore, Maryland, for Appellees. **ON BRIEF:** Amy E. Askew, WHITEFORD, TAYLOR & PRESTON, L.L.P., Baltimore, Maryland; J. Andrew McKinney, ADELBERG, RUDOW, DORF & HENDLER, L.L.C., Baltimore, Maryland; Gerard P. Martin, Thy C. Pham, MARTIN, SNYDER & BERNSTEIN, P.A., Baltimore, Maryland; Kathryn M. Goldman, JIRANEK, GOLDMAN & MINTON, L.L.C., Baltimore, Maryland, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

On a motion for summary judgment filed in this copyright infringement action, the district court held that the defendants' copying of a copyrighted manuscript for introduction into evidence in a state-court child-custody proceeding constituted a "fair use" of the manuscript under the Copyright Act, 17 U.S.C. § 107, when the substance of the manuscript was relevant to the issues in the child-custody proceeding and the defendants' use of the manuscript was solely for its content and not for its mode of expression. The district court also awarded attorneys fees, under 17 U.S.C. § 505, to the prevailing *individual* defendants but not to the law-firm defendants because the law firms

were represented by a member of the firm and thus were acting *pro se*.

For the reasons given in this opinion, we affirm the district court's summary judgment and its award of attorneys fees to the individual defendants, and we remand for reconsideration of the law-firm defendants' motion for attorneys fees.

I

In the child-custody case of *Slavin v. Slavin*, commenced in July 2000 and pending in the Circuit Court for Baltimore City, Case No. 95249006/CE 201677, Alyson Slavin Bond sued her former husband, William Slavin, for exclusive custody of their three children. William Slavin filed a cross-petition for exclusive custody and, in support of his position, introduced into evidence an autobiographical manuscript written by Alyson's current husband, William Bond, to establish that the home of Alyson and William Bond would not be a suitable place for the three children. Bond's manuscript was entitled *Self-Portrait of a Patricide: How I Got Away with Murder*.

In June 1981, when William Bond, who was formerly known as William Rovtar, was 17, he beat his father to death with a hammer in his grandparents' garage in Bainbridge Township, Ohio. After Rovtar was arrested and detained in a juvenile detention facility in Ohio, he entered into a guilty-plea agreement in juvenile court with the result that in September 1981 he was transferred to the Sheppard & Enoch Pratt Hospital in Baltimore, Maryland, for psychological treatment. Rovtar was released in 1982, and after his release, he legally changed his name to William Bond. He remained in Maryland and thereafter became employed as a tennis instructor at a country club, a bicycle salesman, and a bodyguard, among other things.

In 1987, Bond began to write *Self-Portrait of a Patricide: How I Got Away with Murder*, "the true story of and by William Bond," which he hoped to market to publishers for profit. The manuscript describes in horrific detail how Bond planned and committed the murder of his father with a hammer, and how his dying father attempted to raise himself off the floor of the garage before Bond delivered the final blows to his neck and head. It describes Bond wiping away his

fingerprints, scrubbing the garage floor, cleaning blood, flesh, and bone from his clothes, and stuffing his father's dead body in his car's trunk. Most sinister of all, it depicts a remorseless individual who brags about fooling the police and the juvenile system to "get away scot-free" and even collecting, as planned, the money from his father's estate. Although verifiable facts of the murder are consistent with the details provided in the manuscript, Bond has now stated in an affidavit that the manuscript is "a highly fictionalized and stylized work," based on his "juvenile experience." Bond circulated his manuscript directly and through agents in order to find a publisher, asking for a seven-figure advance. His efforts, however, were unsuccessful. After some revisions, Bond also gave a copy of the manuscript to Norman Pessin, an attorney who had represented Bond in various unrelated matters, to help him get the manuscript published, but his efforts, too, failed. Although Pessin thereafter died, his widow retained a copy of the manuscript.

Bond met Alyson Slavin in early 1995, after Alyson was separated from her husband, William Slavin. Bond and Alyson continued to see each other until they married in May 2001. In 1996, shortly after Bond and Alyson met, Bond wrote a lengthy letter to Alyson's father, Kenneth Blum, Sr., indicating that he intended to marry Alyson and become the stepfather of her children. The letter offered an analysis of individual members of Blum's family and purported to offer "solutions" to correct perceived deficiencies in the Blum-Slavin extended family. In addition, the letter set forth an expansive financial plan, pursuant to which Bond demanded from Blum a dowry, a salary, establishment of an investment account, purchase of a studio apartment in addition to a house, and a severance package should Bond's marriage with Alyson not work out. Bond stated to Blum, "You can pay me now or pay me later." In this letter, Bond also made reference to his personal history, stating that he "had a past," and that, although it was "none of [Blum's] business," it makes "interesting reading."

Blum not only found this letter very disconcerting, considering it to be an attempt to extort money from him, but he also became concerned for the safety of Alyson and her children. In June 2000, just before the state custody action was commenced, Blum hired a private investigator, Dudley F. B. Hodgson, to look into Bond's background. At their first meeting, Blum gave Hodgson an overview of his deal-

ings with Bond and expressed his concern over both the safety of his grandchildren and Bond's effort to "shake him down" for money. Blum gave Hodgson a copy of the letter that Bond had sent him and told Hodgson that he had heard that Bond may have had some problems with his family involving violence in Ohio.

In the course of his investigation, Hodgson learned about the murder of Bond's father and contacted the Bainbridge, Ohio police department, obtaining copies of the police report and other documents relating to the homicide investigation. Hodgson reported these findings to Blum, and at Blum's request, Hodgson went to the home of Miriam Pessin, the widow of Norman Pessin, believing that Bond had also tried to "shake Pessin down" for money before he died. When Hodgson interviewed Miriam Pessin in April 2001 and asked her if she had any information that would be helpful in his investigation of Bond, she told Hodgson that she did have, stored in a box, a loose-leaf copy of a manuscript that Bond authored. Mrs. Pessin stated that Bond had given a copy of the manuscript to her husband for him to read for the purposes of locating a publisher. She later testified that this box of materials was not part of Pessin's legal files, which he carefully kept separate, and that Bond had also given her portions of the manuscript to read. Not wanting to retain the manuscript in her home, Mrs. Pessin gave it to Hodgson. Hodgson made a copy of the manuscript and gave copies to Alyson's ex-husband, William Slavin, and the attorneys representing him in the state custody action. William Slavin's attorneys made the manuscript an exhibit during the deposition of Alyson in July 2001 and intended to make it a part of the custody litigation in the Circuit Court for Baltimore City, in which a hearing was scheduled for December 10, 2001. For the sole purpose of preventing further use of the manuscript in the proceedings before the Baltimore City Circuit Court, Bond registered a copy of his manuscript with the Copyright Office in August 2001.

Immediately after registering the manuscript, Bond commenced this action for copyright infringement, naming as defendants Blum, Blum's son, Hodgson, William Slavin, and Slavin's attorneys. He requested a preliminary and permanent injunction prohibiting the use of the manuscript by the defendants for any purpose and requiring the return of all existing copies.

At the hearing on Bond's motion for a preliminary injunction, the district court heard testimony from Alyson Bond, Blum, Hodgson, and Mrs. Pessin, among others. Following the hearing, the court found that Bond had written the manuscript and had delivered it to Pessin and others in an effort to get it published. The court found that Pessin's efforts to get the book published were not "part of [Pessin's] legal practice, because he wasn't doing this as a lawyer." The court concluded that the document was not "a confidential document in any kind of privileged sense." In addition, the court found that Hodgson did not steal the document but was given the document by Pessin's wife.

On the merits of the copyright infringement issue, the court evaluated the defendants' defense of "fair use" by applying the four factors set forth in 17 U.S.C. § 107. The court concluded that (1) the purpose and character of the defendants' anticipated use of the manuscript was not one against which the Copyright Act sought to protect; (2) the nature of the manuscript did not weigh against the finding of a "fair use"; (3) the defendants were seeking to introduce the entire manuscript, which weighed against a finding of fair use; and (4) the use would have "absolutely zero" detrimental effect on the potential market for the copyrighted work and could, "in a perverse way," actually increase its market value. Based on these conclusions, the court held that the challenged use was a "fair use." The court thus denied Bond's motion for a preliminary injunction, and then, based on the undisputed facts, granted summary judgment in favor of the defendants on November 20, 2001.*

When Bond filed a motion to alter or amend the judgment, the district court denied the motion, finding that Bond was again "blurring the distinction between the copyright protection afforded the mode of expression in a written work and the ideas and facts in the public domain which are expressed in the work." The court observed that Bond had not established any likelihood that the defendants intended to utilize the manuscript in any way other than that deemed by the court to be a fair use, and that, in the event they tried to use it for

---

*Counsel for the parties state that at the custody hearing on December 10, 2001, in state court, William Slavin's attorneys in fact introduced the manuscript into evidence.

other purposes, they would do so "at the risk of being sued as a wil[l]ful infringer."

Pursuant to motions filed by the defendants, the district court awarded attorneys fees to the individual defendants under 17 U.S.C. § 505, but not to the law-firm defendants because the law firms were representing themselves *pro se*. The court also denied the law-firm defendants' motions for sanctions against Bond pursuant to Federal Rule of Civil Procedure 11.

Bond filed an appeal from the district court's summary judgment entered on November 27, 2001, and the court's subsequent order awarding attorneys fees. The law-firm defendants cross-appealed from the district court's denial of their motions for attorneys fees and for Rule 11 sanctions.

II

Bond contends that the district court adopted a *per se* rule that use of copyrighted material as evidence in a legal proceeding is always a "fair use," "overriding" the analysis for finding "fair use" required by 17 U.S.C. § 107. Acknowledging that the court might be able to find the fair-use doctrine applicable to the use of copyrighted material as evidence, Bond maintains that the court erred in doing so in this case by not considering all of the statutorily prescribed factors.

The defendants note that the district court did in fact consider the factors set forth in § 107 and that the consideration of those factors correctly demonstrated that "the non-commercial use of the manuscript in the child custody litigation did not result in any commercial exploitation of the work or adversely affect its marketability."

The undisputed facts show that the defendants introduced a copy of Bond's copyrighted manuscript into evidence in a state child-custody proceeding to prove that Bond's household would not be a suitable place for the children of Bond's wife. The work, written by Bond and circulated by him in an effort to publish it, describes how Bond, when 17, planned and committed the murder of his father with a hammer, fooled the police about his mental state, used the juvenile

system to obtain merely a "slap on the wrist," and recovered the proceeds of his father's estate, all without remorse. In the manuscript, he stated, "I wanted my father's money." The defendants made copies of the manuscript to use its content as evidence in the child-custody litigation, and there is no evidence of any intent to exploit the book's manner of expression for any purpose, commercial or otherwise. Indeed, there is no evidence in the record to indicate that the defendants' use of the manuscript was anything more than the presentation of evidence in a child-custody proceeding to prove the unsuitability of Bond's home as a place for children. Moreover, there is no evidence that this use adversely affected Bond's interests in the copyright.

Applying the four factors stated in 17 U.S.C. § 107, the district court held that the defendants' use of the work fell within the "fair use" exception established in 17 U.S.C. § 107, principally because the "[p]urpose and character of [the defendants'] use has nothing whatsoever to do with any interest that the copyright law was designed to protect. The copyright law was never designed to protect content as distinguished from mode of expression." The court also concluded that "the effect of the [defendants'] use on the potential market for value of the copyrighted work is absolutely zero."

We review the district court's summary judgment *de novo*, applying the same standard that the district court was required by law to apply for granting the motion for summary judgment. *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997).

The Copyright Act, enacted on the authority of Article I, § 8, of the Constitution, confers on creators of original works a limited monopoly in their works of authorship to advance an important public purpose. "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius." *Id.* (quoting *United States v. Paramount*

*Pictures, Inc.*, 334 U.S. 131, 158 (1948)); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985).

The copyright "monopoly" — i.e., the "bundle of exclusive rights . . . to publish, copy, and distribute" the work, *Harper & Row*, 471 U.S. at 546-47 — is limited and subject to a list of statutory exceptions, including the exception for fair use provided in 17 U.S.C. § 107. *See* 17 U.S.C. § 106; *Sony*, 464 U.S. at 447. Section 107 provides explicitly that "the fair use of a copyrighted work . . . is not an infringement of copyright."

The fair-use doctrine is a longstanding common-law principle, now codified in § 107, that was "traditionally defined as 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.'" *Harper & Row*, 471 U.S. at 549 (quoting H. Ball, *Law of Copyright and Literary Property* 260 (1944)). The reasonableness of a use is determined on a case-by-case basis applying an "equitable rule of reason analysis." *Sony*, 464 U.S. at 448; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994). To guide the determination of whether a particular use is a fair use, § 107 provides that a court must consider four factors among any others relevant:

> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)   the nature of the copyrighted work;
>
> (3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)   the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors are "not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, but rather "illustrative," representing "only general guidance about the sorts of copying that courts and Congress most commonly have found to be fair uses," *Campbell*, 510

U.S. at 577-78. Because a particular use must be examined for its reasonableness in determining whether it is a "fair use," any *per se* rule is inappropriate. *Id.* at 577 ("The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis"); *id.* at 585 ("The Court of Appeal's elevation of one sentence from *Sony* to a per se rule thus runs as much counter to *Sony* itself as to the long common-law tradition of fair usage adjudication"); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 202 (4th Cir. 1998) (noting that fair use demands a case-by-case inquiry).

A fair-use analysis bears relevance only when a challenged use violates a right protected by the Copyright Act. But the statutorily protected rights are themselves limited in that a copyright does not secure an exclusive right to the use of facts, ideas, or other knowledge. Rather, a copyright gives an author exclusive rights only with respect to his manner of expression. *See, e.g.*, *Baker v. Selden*, 101 U.S. 99, 102 (1879); *Superior Form Builders, Inc. v. Chase Taxidermy Supply Co.*, 74 F.3d 488, 492 (4th Cir. 1996) (noting that "the originality inherent in each author's expression is the essence of the proprietary interest protected"). In *Superior Form Builders*, we noted that even though the Copyright Act will protect even the minimal quantum of originality — "independent creation plus a modicum of creativity," *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991) — the public has an interest in retaining in the public domain "the right to discover facts and exchange ideas freely. Thus, copyright protection does not extend to ideas or facts even if such facts were discovered as the product of long and hard work." *Superior Form Builders*, 74 F.3d at 492 (internal citation omitted).

With these general principles of copyright law in hand, we now turn to the question before us of whether the defendants' use of Bond's copyrighted manuscript as evidence in the child-custody proceeding was subject to the fair-use exception defined in § 107. To make that determination, we apply the four factors set forth in § 107.

A

The first § 107 factor directs the inquiry into the "purpose and character of the [defendants'] use, including whether such use is of a com-

mercial nature or is for nonprofit educational purposes." 17 U.S.C.
§ 107(1). The use of a copyrighted work for a commercial purpose
"tends to weigh against a finding" that the challenged use is a "fair
use." *Harper & Row*, 471 U.S. at 562. The "crux of the prof-
it/nonprofit distinction is not whether the sole motive of the use is
monetary gain but whether the user stands to profit from exploitation
of the copyrighted material without paying the customary price." *Id.*
If a challenged use of a copyrighted work is noncommercial, the party
alleging infringement must demonstrate "either that the particular use
is harmful, or that if it should become widespread, it would adversely
affect the potential market for the copyrighted work." *Sony*, 464 U.S.
at 451.

Application of this factor weighs heavily against Bond's infringe-
ment claim. The defendants' use of Bond's copyrighted manuscript is
not for any commercial purpose; the defendants are not seeking to
exploit the copyrighted material without paying the customary price.
Indeed, the defendants' use is indifferent to Bond's mode of expres-
sion. Rather, the narrow purpose of defendants' use of the manuscript
is for the evidentiary value of its content insofar as it contains admis-
sions that Bond may have made against his interest when he bragged
about his conduct in murdering his father, in taking advantage of the
juvenile justice system, and in benefiting from his father's estate.
These are all facts relevant to the custody decision, and their use does
not draw on Bond's mode of expression.

Because the challenged use is noncommercial, Bond must demon-
strate that the use of the manuscript as evidence in the litigation
would harm the potential market for his manuscript. Neither in his
brief nor at oral argument has Bond been able to identify any harm
or potential harm to his work against which the law of copyrights pro-
tects. The only harm that we can discern from his arguments is a
claim that he has lost the right to control the release of a "private" or
"confidential" document. But at oral argument, he conceded that the
document was not confidential. Indeed, it is apparent that Bond has
circulated the document in an effort to have it published. But more
importantly, the protection of privacy is not a function of the copy-
right law. *See, e.g.*, *New Era Publications Int'l APS v. Henry Holt &
Co.*, 695 F. Supp. 1493, 1504-05 (S.D.N.Y. 1988) (Leval, J.). To the
contrary, the copyright law offers a limited monopoly to encourage

ultimate *public access* to the creative work of the author. If privacy is the essence of Bond's claim, then his action must lie in some common-law right to privacy, not in the Copyright Act. *See, e.g.*, *Lawrence v. A.S. Abell Co.*, 475 A.2d 448, 450-51 (Md. 1984).

B

We next consider the second factor, "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor focuses attention on the extent to which a work falls at the core of creative expression. *See Campbell*, 510 U.S. at 586. Thus, for example, a fictional work might be closer to the core of copyright than a factual work. *See, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 237-38 (1990).

That Bond's manuscript is unpublished and contains a stylized mode of expressing his feelings about historical facts weigh against a finding of fair use. *See Harper & Row*, 471 U.S. at 564. But, as *Campbell* instructs, we do not consider the § 107 factors "in isolation, one from another," but we weigh them together "in light of the purposes of copyright." 510 U.S. at 578. Where, as here, the use of the work is not related to its mode of expression but rather to its historical facts and there is no evidence that the use of Bond's manuscript in the state legal proceedings would adversely affect the potential market for the manuscript, one cannot say the incentive for creativity has been diminished in any sense. And because the societal benefit of having all relevant information presented in a judicial proceeding is an important one, it should be furthered if doing so would not unduly undermine the author's rights with regard to his creative work.

C

Under the third § 107 factor, we examine the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). As a general matter, as the amount of the copyrighted material that is used increases, the likelihood that the use will constitute a "fair use" decreases. But this is an imperfect generalization. *Compare Harper & Row*, 471 U.S. 569 (holding that publication of only some 300 words from unpublished memoirs of President Ford was not a fair use given the quality of the quoted language), *with Campbell*, 510 U.S. at 594 (holding that even qualitatively substantial

copying in a parodical song is fair use when such copying serves the necessary function of "conjuring up" the original song to advance the parody). "The extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87.

It is conceded that the defendants' challenged use of the manuscript in the state-court proceeding involved all, or nearly all, of the copyrighted work. Its use, however, was not for its expressive content, but rather for its allegedly factual content. The sole purpose and intent of introducing Bond's manuscript was to obtain admissions of fact against his interest in an effort to prove that his home would not be a suitable place for custody of children. The use of the copyrighted material in this context, even the entire manuscript, does not undermine the protections granted by the Act but only serves the important societal interest in having evidence before the factfinder. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994) ("We have often recognized the monopoly privileges that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good"). Because the manuscript was not used to undermine any right conferred by the Copyright Act, Bond can derive little benefit from this factor in the context of this case.

## D

Finally, we consider the effect of the defendants' use of Bond's copyrighted manuscript "upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. This is so because it touches most closely upon the author's ability to capture the fruits of his labor and hence his incentive to create. Under this core inquiry, we determine whether the defendants' introduction of the manuscript in evidence would materially impair the marketability of the work and whether it would act as a market substitute for it.

On this factor, there is no evidence that the admission into evidence of Bond's manuscript would adversely affect its marketability. Indeed, the district court made the observation: "Ironically, if any-

thing, [the defendants' use] increases the value of the work in a perverse way, but it certainly doesn't decrease it."

E

In sum, we conclude that the district court did not err in concluding that the defendants' use of the manuscript as evidence in the state-court proceeding fell within the scope of fair use authorized by § 107 of the Copyright Act. To the contrary, we agree with the district court when it stated:

> Purpose and character of [the defendants'] use has nothing whatsoever to do with any interest that the copyright law was designed to protect. The copyright law was never designed to protect content as distinguished from mode of expression.

> \* \* \*

> It was certainly never intended to utilize, to keep from the public the ability to state the facts in a document as compared to the mode of expression.

> \* \* \*

> [Moreover], the effect of [defendants'] use on the potential market for value of the copyrighted work is absolutely zero.

III

Bond also contends that the district court erred in awarding attorneys fees to the individual defendants as prevailing parties, under 17 U.S.C. § 505. The district court awarded $6,675.45 each to the defendants Dudley Hodgson, Kenneth Blum, Jr., and Kenneth Blum, Sr., and $8,699.70 to William Slavin.

Bond does not contest the amount of the awards, but he argues that the district court's findings on the factors relevant to an award of attorneys fees were not justified. He argues that he was only seeking

to protect his rights under the Copyright Act and that his rights should not be chilled by an assessment of attorneys fees. He argues expansively that the question of whether the introduction of a copyrighted work into evidence was a fair use is a close question, particularly when there are no controlling authorities on point.

We review the district court's award of attorneys fees under 17 U.S.C. § 505 for abuse of discretion, reversing subsidiary factual findings only if they are clearly erroneous. *Diamond Star Bldg. Corp. v. Sussex Co. Builders, Inc.*, 30 F.3d 503, 506 (4th Cir. 1994).

The Copyright Act provides:

> [T]he court in its discretion may allow the recovery of full costs by or against any party. . . . Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505. To determine whether an award of attorneys fees should be made to a party under § 505, we have articulated four factors for consideration: "(1) the motivation of the parties, (2) the objective reasonableness of the legal and factual positions advanced, (3) the need in particular circumstances to advance considerations of compensation and deterrence, and (4) any other relevant factor presented." *Diamond Star*, 30 F.3d at 505 (quoting *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 234 (4th Cir. 1993) (internal quotation marks omitted)).

In applying these factors to the circumstances before it, the district court found that Bond's motivation in bringing his copyright infringement action was "to block potentially relevant evidence from being presented" in the child custody proceeding. In essence, the court stated that Bond misused the Copyright Act and that he was motivated by a desire to suppress the underlying facts of his copyrighted work rather than to safeguard its creative expression. Assessing the reasonableness of the legal positions advanced by Bond, the court concluded that the fair-use question presented by Bond's complaint was "not a close one" and that Bond's position was "frivolous," although the court recognized that frivolousness was not essential to an award of attorneys fees. The court concluded that it was unreason-

able for Bond to use a copyright infringement action to attempt to bar introduction of facts disclosed in the work as admissions against his interest, particularly when the information was relevant to child-custody issues. Finally, the court stated that Bond and others in a position similar to him "should be deterred from bringing meritless actions."

We conclude that the district court, in reaching these conclusions, did not clearly err in its factfinding and, in applying the *Rosciszewski* factors to award attorneys fees to the prevailing individual defendants, did not abuse its discretion.

## IV

The two law-firm defendants — McDaniel, Bennett & Griffin and Adelberg, Rudow, Dorf & Hendler, LLC — also sought attorneys fees under 17 U.S.C. § 505, but the district court denied them because it concluded that the firms were acting *pro se* and therefore were not entitled to fees. The law firms cross-appealed, arguing that the district court erred in applying to them the *pro se* exception, as stated in *Kay v. Ehrler*, 499 U.S. 432 (1991) (holding that an attorney representing himself is ineligible for attorneys fees under 42 U.S.C. § 1988).

Because of the absence of judicial precedents and in view of the insight provided by our decision in *Doe v. Board of Education of Baltimore County*, 165 F.3d 260 (4th Cir. 1998) (denying statutory fees to an attorney-parent of a child with a disability who was a prevailing party under 20 U.S.C. § 1415(i)(3)(B)), the district court believed that it could not award fees under 17 U.S.C. § 505 to a prevailing law firm when members of that law firm represent the firm. The district court held conditionally that if it had been given "discretion to award counsel fees to the law firm defendants, it would do so," but it would have awarded "substantially less than the amount claimed because . . . had there been independent counsel being paid by the law firm Defendants, the matter would have been handled at far less cost than is sought from the Plaintiff."

The law firms contend that the district court erred in concluding that the law firms were proceeding *pro se* and that the cases of *Kay* and *Doe* preclude an award of fees to them under § 505. They state

that they are "legal entities represented by attorneys," albeit attorneys within the firm. They argue that the Supreme Court's statement in *Kay* that "an organization is not comparable to a *pro se* litigant" is dispositive on this issue. *Kay*, 499 U.S. at 436 n.7. They argue additionally that Local Rule 101.1(a) of the District of Maryland states that "[o]nly individuals may represent themselves." They maintain that a law firm using members to represent the firm is more analogous to a State or a corporation represented by its own in-house counsel. In each of the situations, they note, the attorney-client relationship is created between the organization and the attorney, just as it was between the law firms and the members representing them.

This is an issue of first impression in our circuit, but its resolution may readily be derived from the Supreme Court's decision in *Kay* and our decision in *Doe*.

The principle that a *pro se* litigant who is *not* a lawyer is not entitled to attorneys fees authorized by a fee-shifting statute is not disputed. *See, e.g.*, *Gonzales v. Kangas*, 814 F.2d 1411 (9th Cir. 1987); *Smith v. DeBartoli*, 769 F.2d 451 (7th Cir. 1985); *Owens-El v. Robinson*, 694 F.2d 941 (3d Cir. 1982). The question more analogous to the facts before us — whether a *pro se* litigant who is *also* an attorney would be entitled to such fees — was addressed by the Supreme Court in *Kay*. In *Kay*, the Court held that a plaintiff who was also an attorney and who prevailed in a civil rights action was nonetheless not entitled to fees under 42 U.S.C. § 1988(b), which authorizes attorneys fees to the prevailing party, notwithstanding the fact that the attorney "obviously handled his professional responsibilities . . . in a competent manner." 499 U.S. at 435. The Supreme Court rested its conclusion on three principles. First, as a textual matter, it concluded that an "attorney," whose fees would be reimbursable under § 1988, "assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as a predicate for an award under § 1988." *Id.* at 436. Second, the Court focused on the purpose of fee-shifting statutes "to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights." *Id.* And third, an award of fees to only those litigants who have retained independent counsel ensures "the effective prosecution of meritorious claims." *Id.* at 437. Explaining this more fully, the Court stated:

Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgement of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that "a lawyer who represents himself has a fool for a client" is the product of years of experience by seasoned litigators.

*Id.* at 437-38 (footnote omitted).

In *Doe*, we applied the principles of *Kay* to a fee-shifting provision in the Individual with Disabilities Education Act ("IDEA"), denying a parent, who was also an attorney, a right to collect fees under the statute for his representation of his child. 165 F.3d at 265. Even though a parent who was also an attorney was distinct from and therefore an agent for the prevailing child, who would otherwise be entitled to fees under IDEA, 20 U.S.C. § 1415(i)(3)(B), we concluded that "[l]ike attorneys appearing *pro se*, attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that 'reason, rather than emotion' will dictate the conduct of the litigation." *Id.* at 263 (quoting *Kay*, 499 U.S. at 437). Because a parent-attorney's representation of his child was akin to *pro se* representation, we employed the rationale of *Kay* to find that the parent-attorney representation of a child in an IDEA case fell within the "special circumstances" exception barring fees where such an award would be unjust. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

But the principles of *Kay* and *Doe*, which were applied to deny a prevailing party attorneys fees under fee-shifting statutes, do not apply in circumstances where entities represent themselves through in-house or *pro bono* counsel. In *Kay*, the Supreme Court explained the distinction: "[A]n organization is not comparable to a *pro se* litigant because the organization is always represented by counsel, whether in-house or *pro bono*, and thus, there is always an attorney-

client relationship." 499 U.S. at 436 n.7. When a member of an entity who is also an attorney represents the entity, he is in an attorney-client relationship with the entity and, even though interested in the affairs of the entity, he would not be so emotionally involved in the issues of the case so as to distort the rationality and competence that comes from independent representation. Accordingly, a State's own attorneys representing the State may be awarded attorneys fees under a fee-shifting statute. *See Wisconsin v. Hotline Indus., Inc.*, 236 F.3d 363 (7th Cir. 2000). And in-house counsel representing the corporation for whom they work may also be awarded attorneys fees. *See Textor v. Bd. of Regents of Northern Ill. Univ.*, 711 F.2d 1387, 1396 (7th Cir. 1983) ("Defendants chose to hire in-house counsel because that was the most efficient means of handling a large amount of legal work. . . . [F]or every hour in-house counsel spent on this case, defendants lost an hour of legal services that could have been spent on other matters").

Though representation of a law firm by one of its members presents an increased risk of emotional involvement and loss of independence, the law firm still remains a business and professional entity distinct from its members, and the member representing the firm as an entity represents the firm's distinct interests in the agency relationship inherent in the attorney-client relationship. Although a given representation of a law firm by one or more of its members could suffer from a lack of independence, there is no indication in this case of a relationship that tended to distort independent judgment, as existed in *Doe*.

Because the district court indicated that it was inclined to award the law-firm defendants fees, although not all the fees requested, and would have done so but for the *pro se* prohibition, we now remand this case to authorize, but not require, the district court to award § 505 fees if it determines, in its discretion, to do so.

V

The law-firm defendants also contend that the district court erred in denying their motion for sanctions under Federal Rule of Civil Procedure 11. In denying their motion, the district court stated, "It appears well settled that unless a Rule 11 motion is filed in accor-

dance with the 21 day 'safe harbor' warning provision, it cannot be granted." The court, however, did not have the benefit of our decision in *Rector v. Approved Fed. Savings Bank*, 265 F.3d 248 (4th Cir. 2001), which had been decided only shortly before the court ruled. In *Rector*, we held that the safe harbor provision was not jurisdictional and could be waived if not properly asserted.

Without expressing any opinion on how the motion for sanctions should be decided, we remand this issue to the district court for further consideration of the motion, taking into account our decision in *Rector*.

Accordingly, the judgment of the district court is

*AFFIRMED IN PART AND VACATED*
*AND REMANDED IN PART.*