# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-2885

_____

Treasurer, Trustees of Drury Industries, Inc. Health Care Plan and Trust

*Plaintiff - Appellant*

v.

Sean Goding; Casey & Devoti, P.C.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: April 19, 2012
Filed: September 7, 2012

_____

Before MURPHY, MELLOY, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Sean Goding was a beneficiary of an ERISA (Employee Retirement Insurance Security Act, 29 U.S.C. § 1001, et seq.) Plan administered by Treasurer, Trustees of Drury Industries, Inc. Health Care Plan and Trust ("Drury"). Goding sustained injuries in a slip and fall accident and received $11,423.79 in benefits from the Drury-administered Plan. Goding also obtained compensation through the settlement of a civil suit related to those injuries. Pursuant to a subrogation provision in the ERISA

Plan, Drury attempted to secure reimbursement from Goding for the benefits it paid, but was unable to do so after Goding declared bankruptcy. Drury then attempted to obtain that reimbursement from the firm that represented Goding, Casey & Devoti, P.C. ("Casey"). The district court[1] found that Drury could not obtain such reimbursement because Casey had not agreed to the Plan's subrogation provision and consequently was not contractually bound by it. It also found that Drury could not maintain a suit against Casey in equity and could not bring a state cause of action for conversion against Casey. Finally, after several more months of litigation, the district court awarded Casey attorneys' fees for successful defense of a subsequent motion. We now affirm the district court in all respects.

I

The Plan contains a subrogation provision that "appl[ies] when Plan benefits are paid as a result of injuries or illness you sustained and you have a right to a Recovery or have received a recovery." Under this provision:

> The Administrator, on behalf of the Employer, has the right to recover Plan payments made on your behalf from any party responsible for compensating your injuries. The following apply:
>
> > -The Administrator, on behalf of the Employer, has first priority for the full amount of benefits they have paid from any Recovery regardless of whether you are fully compensated, and regardless of whether the payments you receive make you whole for your losses and injuries.

---

[1]The Honorable Stephen N. Limbaugh, Junior, United States District Judge for the Eastern District of Missouri.

-You and your legal representative must do whatever is necessary to enable the Administrator, on behalf of the Employer, to exercise their rights and do nothing to prejudice them.

- The administrator, on behalf of the Employer, has the right to take whatever legal action they see fit against any party or entity to recover the benefits paid under the Plan.

- To the extent that the total assets from which a Recovery is available are insufficient to satisfy in full the Administrator's subrogation claim and any claim still held by you, the Administrator's subrogation claim shall be first satisfied before any part of Recovery is applied to your claim, your attorney fees, other expenses or costs.

In addition to receiving benefits from the ERISA Plan, Goding also brought a civil suit for negligence. In that action, he was represented by the law firm Casey.

During its representation of Goding, Casey twice acknowledged Drury's subrogation agreement. First, on January 15, 2009, Casey wrote in correspondence with Drury, "[t]his will confirm that we do acknowledge Drury Inns, Inc.'s, lien in this matter." Second, on March 16, 2009, Casey wrote: "we are not challenging your right to reimbursement/subrogation for payments made for the health care of Sean Goding relating [to] the injuries caused by his fall at the Hilton." Goding, through Casey, eventually settled the civil suit. When Casey received the settlement money, it kept a portion for payment of its attorneys' fees, held $11,423.79 (the amount subject to Drury's subrogation interest) in trust, and disbursed the remainder to Goding. After about a month, however, Casey also disbursed the $11,423.79 to Goding. Despite receiving this money, Goding eventually declared bankruptcy and has not reimbursed Drury for the benefits it paid him.

Drury then attempted to recover those benefits from Casey, bringing this suit and asserting theories of equitable lien by agreement, restitution, imposition of a constructive trust, tortious interference with contractual relations, and conversion. Upon cross-motions for summary judgment, the district court, on March 1, 2010, granted Casey's motion and denied Drury's.[2] Over a year later on March 15, 2011, Drury filed a second motion for summary judgment, claiming it was based on new authority. This claimed new authority was Boeing Co. v. Thurmon, No. 4:9-cv-1456, 2009 WL 4782085 (E.D. Mo. Dec. 7, 2009), which was actually decided months before the court ruled on the first motion for summary judgment. The district court denied this second motion on May 19, 2011. A month later, Drury filed a third motion, this time for reconsideration, which the district court also denied. After entering final judgment, the district court awarded Casey attorneys' fees incurred after Casey received Drury's motion for reconsideration. In the order awarding fees, the district court noted that Drury had stretched out the litigation more than a year after the initial decision for no legitimate reason.

Drury appeals from that series of orders, arguing that the district court erred in denying the claims for enforcement of an equitable lien and conversion, and in awarding attorneys' fees to Casey. We find no error and consequently affirm the district court on all issues.

II

We must first consider whether the district court erred in granting Drury leave to file an untimely notice of appeal under Federal Rule of Appellate Procedure 4(a). "[T]he time limits set forth in [Rule] 4(a) are jurisdictional because the limits are

---

[2]The case remained open and no judgment entered under Fed. R. Civ. P. 58 because the portion of the case against Sean Goding had been stayed by the bankruptcy filing.

-4-

derived from statute, 28 U.S.C. § 2107(a)." United States v. Watson, 623 F.3d 542, 545 (8th Cir. 2010) (citing Bowles v. Russell, 551 U.S. 205, 212–13 (2007)). We review a district court's grant of a motion for extension of time to file a notice of appeal for abuse of discretion. Metro. Fed. Bank, F.S.B. v. W.R. Grace & Co., 999 F.2d 1257, 1259 (8th Cir. 1993).

Under Rule 4(a)(1), the time for filing a notice of appeal is thirty days "after entry of judgment or order appealed from." The district court may extend the time to file a notice of appeal if the party seeking an extension "shows excusable neglect or good cause." Fed. R. App. P. 4(a)(5)(A)(ii). We consider four factors in determining whether excusable neglect or good cause for an extension exists: (1) the danger of prejudice to the non-moving party; (2) the length of delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. Lowry v. McDonnell Douglas Corp., 211 F.3d 457, 462 (2000) (citing Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 395 (1993)). These four factors are not equally important; "the excuse given for the late filing must have the greatest import" and "will always be critical to the inquiry." Lowry, 211 F.3d at 463. We have recognized that "excusable neglect includes late filings caused by inadvertence, mistake or carelessness." Sugarbaker v. SSM Health Care, 187 F.3d 853, 856 (8th Cir. 1999) (internal quotation marks omitted). To be reasonable, it is not necessary that the neglect be "caused by circumstances beyond the control of the movant." Lowry, 211 F.3d at 463 (internal quotation marks omitted).

The reason for Drury's untimely filing here is a computer error. Drury's counsel used a calendaring application to calculate the date thirty days from the entry of final judgment, but that application produced an output that was one day later than the actual deadline. Because the date the program produced was a Saturday, Drury filed its notice of appeal on the following Monday.

-5-

The district court's determination that this inadvertent mistake or carelessness was excusable neglect was not an abuse of discretion. Drury missed the deadline not because it ignored the deadline or procrastinated but because it made an error in attempting to comply. Compare Sugarbaker, 187 F.3d at 856 (finding excusable neglect when an attorney attempted to comply with a deadline but miscalculated it and filed the request one day late), with Lowry, 211 F.3d at 463–64 (finding neglect was not excusable when the delay was due to "garden-variety attorney inattention," and the attorney's excuses for it were "thin" and confused). But see Symbionics Inc. v. Ortlieb, 432 F. App'x 216, 220 (4th Cir. 2011) (unpublished) ("Counsel's total dependence on a computer application . . . to determine the filing deadline for a notice of appeal is neither extraneous to nor independent of counsel's negligence. . . . [T]his neglect is precisely the sort of run-of-the-mill inattentiveness by counsel that we have consistently declined to excuse in the past." (internal quotation marks omitted)).

The other factors also support the district court's finding of excusable neglect. The first two factors weigh in favor of Drury: because the filing was only one day late, both the danger to the non-moving party and the length of delay were minimal. There was also no indication that Drury's tardy filing was in any way motivated by bad faith.[3] Accordingly, the district court did not abuse its discretion in granting Drury leave to file an untimely notice of appeal.

---

[3]Casey asks us to consider these last three factors more broadly, arguing we should consider Drury's conduct throughout this lawsuit cumulatively along with the danger to Casey, the delay, and the bad faith stemming from this particular motion. However, our cases do not indicate that such a broad, cumulative approach is appropriate, and we decline to embrace it here. See, e.g., Lowry, 211 F.3d at 463–64 (discussing only the immediate circumstances surrounding the tardy filing); Sugarbaker, 187 F.3d at 856 (same).

III

Drury attempts to recover its subrogation lien via two avenues. First, it argues it may enforce the terms of the ERISA Plan against Casey because Casey agreed to those terms. Second, Drury argues that even if Casey did not agree to those terms, Drury may sue Casey in equity. Although we agree that recovery is generally possible under either of those theories, see CGI Tech. & Solutions, Inc. v. Rose, 683 F.3d 1113, 1117 (9th Cir. 2012) (noting that ERISA § 502(a)(3) does not limit the universe of possible defendants to only signatories of ERISA plans, and that equitable actions against trustees or fiduciaries may also be possible), in this case, neither allows Drury to recover.

A

We now turn to the merits of the case and consider whether Casey's acknowledgment of the Plan's subrogation provision created an implied contract between Casey and Drury. "We review the decision to grant summary judgment de novo and will affirm if, viewing the evidence in the light most favorable to the nonmoving party, we conclude there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 875 (8th Cir. 2009). A subrogation agreement between a client and an ERISA plan is only enforceable against a client's attorney if the attorney "agrees with a client and a plan to honor the plan's subrogation right." S. Council of Indus. Workers v. Ford, 83 F.3d 966, 969 (8th Cir. 1996); see also Hotel Emps. & Rest. Emps. Int'l Union Welfare Fund v. Gentner, 50 F.3d 719, 721 (9th Cir. 1995) (Lay, J., sitting by designation) ("A subrogation agreement or lien can

be enforced against the attorney *only* if the attorney agrees with the client and creditor to protect the lien.").[4]

In Gentner, the Ninth Circuit reasoned that "[m]ere notice or knowledge of the subrogation agreement or lien does not constitute an implied contract" between the attorney and the plan. Gentner, 50 F.3d at 721. In that case, the client, Joseph Newell, received benefits from an ERISA fund for injuries he suffered when he was struck by a car. In connection with those benefits, Newell executed a subrogation agreement with the fund in which he agreed to reimburse the fund for all payments it made to him to the extent that he received money from any other insurer. Id. at 720. Newell's attorney was aware of the subrogation agreement but did not sign or otherwise agree to it. Id. The Ninth Circuit held that under these facts, the fund could not enforce the lien as an implied contract against the attorney. Id.

Unlike in Gentner, the attorney in Ford not only knew about the subrogation agreement but also "himself signed the subrogation agreement." Ford, 83 F.3d at 969. In that case, before the client settled her personal injury claim with the plan administrator, both she and her attorney "signed a subrogation agreement providing that they would reimburse the fund from the proceeds of any recovery received for [the client's] injuries." Id. at 968. This was the key fact for our holding in that case.

_____

[4]In CGI Technologies, the Ninth Circuit recognized the abrogation of Gentner's holding that the universe of possible defendants under § 502(a)(3) only includes attorneys when they were signatories of ERISA plans. 683 F.3d at 1117 (citing Harris Trust & Savings Bank v. Salomon Smith Barney, 530 U.S. 238 (2000)). As discussed above, we agree with the Ninth Circuit that attorneys may be liable in equity even if they are not signatories to ERISA plans. However, we believe Gentner is still valid and instructive with regard to its analysis of the circumstances under which attorneys may become signatories to ERISA plans. Accordingly, our references to Gentner should be understood to rely only on that case's analysis of that narrow issue.

Id. at 969. Citing Gentner, we determined that "[b]ecause [the attorney] himself signed the subrogation agreement, . . . the complaint also stated an ERISA claim against him for violation of the subrogation clause." Id.

Here, Drury argues that Casey should be bound by the subrogation agreement on the basis of two letters Casey sent to Drury. First, in a January 15, 2009 letter, Casey wrote: "This will confirm that we do acknowledge Drury Inns, Inc.'s lien in this matter." And second, in a March 16, 2009 letter: "we are not challenging your right to reimbursement/subrogation for payments made for the health care of Sean Goding relating [sic] the injuries caused by his fall at the Hilton." These statements clearly acknowledge the validity and existence of a subrogation agreement between Goding and Drury. However, absent from these statements or any other communication identified by Drury is a promise by Casey to take any action to himself enforce the subrogation agreement or even to ensure that Goding abide by it.

Without such a promise, the acknowledgment alone is insufficient to establish an implied contract. As the district court noted,

> this is not a case like Ford, in which the lawyer actually signed the subrogation agreement. Nor is it a case in which the lawyer unequivocally agreed to transmit a specified amount of money to the plaintiff upon the settlement of the underlying case. Instead, the correspondence consists of nothing more than a simple acknowledgment that the plaintiff held a lien against the settlement proceeds by virtue of its subrogation agreement with Goding. Again, Casey was not a party to that subrogation agreement, and there is no other evidence of a professional or contractual relationship between plaintiff and Casey that would support a duty to plaintiff. And, as held in Gentner, mere notice or knowledge of the subrogation agreement or lien does not constitute an implied contract. Ultimately, although Casey acknowledged the lien, it did not agree to honor or protect the lien.

Treasurer, Trustees of Drury Indus., Inc. v. Sean Goding and Casey & Devoti, P.C., No. 09-00121, slip op. at 4 (E.D. Mo. March 1, 2010) (memorandum and order). We agree with the district court's well-reasoned conclusion on this issue. Although Casey acknowledged the existence of the lien against the settlement proceedings, it never agreed with Drury and Goding to honor the Plan's subrogation right. Because Casey was not a party to the subrogation agreement, Drury cannot enforce that agreement against Casey.

B

Drury argues that even if Casey did not itself agree to the subrogation agreement in the Plan, it still has an equitable remedy against Casey because "Drury's lien attached at the moment Casey received the disputed settlement funds on behalf of Goding." However, this argument is unavailing. Section 502(a)(3) of ERISA authorizes persons to bring a civil action for violation of a plan, but only to obtain equitable, not legal, relief. 29 U.S.C. § 1132(a)(3); see also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210 (2002) (limiting equitable relief in § 502(a)(3) to "those categories of relief that were *typically* available in equity." (internal quotation marks omitted)).

In equity, there was no cause for restitution where the trustee of property wrongfully disposed of another's property, but no longer held that property or its product. Knudson 524 U.S. at 213–14 (quoting Restatement (First) of Restitution § 215 (1937)). A party who has been wrongfully divested of its property was not entitled to equitable relief "merely because of the character of the wrong done to him." Restatement Restitution, at § 215(1) cmt. a (1937). Instead, it could only recover if it proved not only that the other party "once had property legally or equitably belonging to [it]," but also "that he still holds the property or properties which is in whole or part its product." Id. The Restatement describes this distinction between legal and equitable remedies as follows:

if it is shown that the property or proceeds have been dissipated so that no product remains, [the party's] claim is only that of a general creditor of the wrongdoer. Thus, if the wrongdoer has used the money of the claimant in speculation and has lost it all, the claimant cannot enforce a constructive trust of or an equitable lien upon other property of the wrongdoer, and has only a personal claim against the wrongdoer, and is not entitled to priority over other creditors of the wrongdoer.

Id. In other words, where the wrongdoer no longer has the property at issue in its possession, the claim against that party is legal, not equitable. Knudson, 534 U.S. at 210.

Because the recipients of ERISA benefits in Great West Life & Annuity Insurance Co. v. Knudson no longer possessed the settlement funds to which the plan claimed entitlement, Great West had no equitable claim and could not recover those benefits. Knudson, 534 U.S. at 214. The claim in that case was similar to the one here. The Knudsons had received benefits under an ERISA plan and had also collected money in a civil settlement. The ERISA plan contained a subrogation clause, under which the covered employees were obligated to return benefits to Great West to the extent they received compensation for the same injuries from another source. Id. at 207. The settlement funds in that case were not paid directly to the Knudsons but were disbursed by two checks, one to respondents' attorney and the other to a Special Needs Trust (as required by California law). Id. at 214. Thus, "[t]he basis for petitioners' claim [was] not that respondents [held] particular funds that, in good conscience, belong[ed] to petitioners, but that petitioners [were] contractually entitled to *some* funds for benefits that they conferred." Id. The kind of restitution Great West sought, "therefore, [was] not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred on respondents." Id.

-11-

On the other hand, in <u>Sereboff v. Mid Atlantic Medical Services Inc.</u>, 547 U.S. 356 (2006), the Sereboffs, recipients of ERISA benefits, actually received and held the benefits from their settlement, and thus Mid Atlantic could maintain an equitable action against them. <u>Id.</u> at 362–63. This was because Mid Atlantic "sought specifically identifiable funds that were within the possession and control of the Sereboffs—that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and preserved in the Sereboff's investment accounts." <u>Id.</u>; <u>see also</u> <u>Longaberger Co. v. Kolt</u>, 586 F.3d 459, 469 (6th Cir. 2009) (holding that equitable relief under § 502(a)(3) was proper because Longaberger "properly identified a specific fund . . . that was in the possession and legal control of [the defendant], but belonged in good conscience to the Plan.").

Here, like in <u>Knudson</u>, Drury is essentially attempting to impose personal, or legal, liability on Casey for the benefits it conferred on Goding. After receiving the settlement funds from Goding's personal injury law suit, Casey initially held in trust the $11,423.79 to which Drury claims an interest, but he eventually disbursed the entirety of that sum to Goding. Casey thus no longer has any money to which Drury claims an interest. Accordingly, any action by Drury to recover from Casey is legal, not equitable. Because § 502(a)(3) allows only equitable relief, the district court was correct in denying Drury's motion for summary judgment on this issue.

C

Drury also attempts to bring a state cause of action against Casey for conversion of the settlement funds over which Drury asserts an interest. However, we may not consider this cause of action because it is preempted by ERISA. ERISA's preemption provision states its enforcement provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title." 29 U.S.C. § 1144(a); <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 209 (2004). Congress intended courts to read this provision

broadly, in order to protect ERISA's "uniform regulatory regime over employee benefit plans." Davila, 542 U.S. at 208. In particular, the Court has sought to protect ERISA's "integrated enforcement mechanism," § 502(a), which "is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans." Id. at 208; see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987) ("The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." (internal quotation marks omitted)).

ERISA preempts state causes of action whenever "the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated." Davila, 542 U.S. 200, 210 (2004). "In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." Id.

Drury alleges that the ERISA Plan required Casey to hold in trust and eventually to return to Drury any settlement money Goding received for his injuries. Any right that Drury has to the settlement money obtained by Casey and Goding was created by and emanates solely from the Plan. Therefore, Drury's only avenue for enforcing the subrogation agreement in the Plan is ERISA; it may not resort to state law causes of action.

IV

Drury finally argues that the district court should not have awarded attorneys' fees in this case. It asserts that ERISA § 502(a)(1) does not permit the award of attorneys' fees to attorneys that act as counsel to their own firms, as Casey did here. Section 502(g)(1) provides that for "any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

For support, Drury cites Kay v. Ehrler, 499 U.S. 432 (1991), in which the Supreme Court held that 42 U.S.C. § 1988 does not permit attorneys' fees for an attorney who represents himself personally. Id. at 438. In that case, the Court noted that "the word 'attorney' assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as the predicate for an award under § 1988." Id. at 435–36. Thus, where an attorney represents himself personally, an award of attorneys' fees is not appropriate. Importantly, however, the Court also noted in dicta that where an organization engages an in-house attorney, that "organization is not comparable to a *pro se* litigant because the organization is always represented by counsel, whether in-house or *pro bono*, and thus, there is always an attorney-client relationship." Id. at 436 n.7.

Since Kay, three of our sister circuits have relied on footnote 7 to hold that, unlike attorneys who represent themselves personally, in-house attorneys for law firms (and for organizations in general) may be entitled to awards of attorneys' fees. In Baker & Hostetler v. United States Department of Commerce, the D.C. Circuit reasoned that

> [i]n explaining that organizations may recover fees when represented by in-house counsel, the Supreme Court did not distinguish between law firms and other types of organizations. Nor can we see any principled basis for making such a distinction. Footnote 7 suggests that an in-

-14-

house counsel for a corporation is sufficiently independent to ensure effective prosecution of claims, thus justifying fees. An attorney who works for a law firm certainly is no less independent than an attorney who works for a corporation. Therefore, it would make little sense to slice and dice Kay's conclusion regarding "organizations" and apply footnote 7 to *some* organizations but not others.

473 F.3d 312, 325 (C.A.D.C. 2006); see also Bond v. Blum, 317 F.3d 385, 400 (4th Cir. 2003) ("Though representation of a law firm by one of its members presents an increased risk of emotional involvement and loss of independence, the law firm still remains a business and professional entity distinct from its members, and the member representing the firm as an entity represents the firm's distinct interests in the agency relationship inherent in the attorney-client relationship."); Gold, Weems, Bruser, Sues & Rundell v. Metal Sales Mfg. Corp., 236 F.3d 214, 218–19 (5th Cir. 2000) ("[W]hen an organization is represented by an attorney employed by the organization, the attorney has a status separate from the client.").

We join the Fourth, Fifth, and D.C. Circuits to hold that, where an attorney represents his or her own firm, Katz does not forbid the award of attorneys' fees. We agree that there is no meaningful distinction between a law firm and any other organization on the issue of whether there exists an attorney-client relationship between the organization and its attorney.

Moreover, we hold that the district court did not abuse its discretion in awarding attorneys' fees in this case. See Newberry v. Burlington Basket Co., 622 F.3d 979, 982 (8th Cir. 2010) (standard of review). In deciding whether to award attorneys' fees, the district court should consider the following factors:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances;

-15-

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal qeustion [sic] regarding ERISA itself; and (5) the relative merits of the parties positions.

Lawrence v. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984) (internal quotation marks omitted).

Here, the district awarded Casey attorneys' fees not for the entire case, but only for the expenses associated with the motion for reconsideration:

> Although the Court is not convinced that Casey is entitled to the entirety of its attorney's fees, the Court believes that plaintiff caused defendant Casey to unnecessarily incur additional litigation expenses subsequent to plaintiff's filing its Motion for Reconsideration. By that time, Casey had prevailed not once, but twice, and the Motion for Reconsideration was by then entirely reargument and without merit.

The court also discussed the second through fifth factors from Lawrence, finding that Drury could satisfy a fee award, the award would deter others from engaging in dilatory tactics, Casey sought to help other Plan beneficiaries and participants to obtain representation in tort actions, and the relative merits were apparent because Drury "lost its case, on the merits, as a matter of law, three times." Although Drury argues that these factors do not necessitate an award of attorneys' fees in this case, the district court was well within its discretion in awarding them.

Accordingly, we affirm the decision of the district court.

_____