**LOWRY'S REPORTS, INC., Plaintiff,**

v.

**LEGG MASON, INC., et al., Defendants.**

**No. CIV.WDQ–01–3898.**

United States District Court, D. Maryland, Northern Division.

July 10, 2003.

Thomas W. Kirby, Bruce G. Joseph, Scott Eric Bain, Wiley Rein and Fielding LLP, Washington, DC, for Plaintiff.

Terence P. Ross, Thomas H. Dupree, Jr., Gibson Dunn and Crutcher LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

QUARLES, District Judge.

The plaintiff, Lowry's Reports, Inc. ("Lowry's"), has sued the defendants, Legg Mason, Inc., and Legg Mason Wood Walker, Inc. (collectively, "Legg Mason"), for copyright infringement in violation of the Copyright Act of 1976, as amended (the "Copyright Act"), 17 U.S.C. §§ 101 *et seq.*, common-law unfair competition, and breach of contract. The complaint focuses on Legg Mason's use of a financial newsletter, *Lowry's New York Stock Exchange Market Trend Analysis* (the *"Reports"*), which Lowry's publishes in both daily and weekly editions. Desmond Decl. ¶¶ 1–4. Lowry's is a Florida corporation, headquartered in Florida. Compl. ¶ 7. Legg Mason, Inc., a Maryland corporation headquartered in Maryland, is a global financial-services firm, whose business may be divided into three broad categories: asset

management, securities brokerage, and investment banking. Defs.' Mot., Ex. 5. Legg Mason Walker Wood, Inc., its wholly owned subsidiary, likewise a Maryland corporation, primarily brokers securities. Yoo Decl., Ex. 32.

Legg Mason has filed a motion for summary judgment on all of Lowry's claims. Alternatively, it seeks partial summary judgment to foreclose two of Lowry's claims for damages under the Copyright Act: (1) any claim for Legg Mason's profits; and (2) any claim for enhanced statutory damages for willful infringement. Lowry's, in turn, has filed a cross motion for partial summary judgment on two issues: (1) Legg Mason's liability for copyright infringement; and (2) the unavailability of reduced statutory damages for "innocent" infringement.

### BACKGROUND

Lowry's *Reports* provide original and proprietary technical analysis of the stock market. Each issue includes unique statistics, comparative graphs, charts, and commentary drafted by Lowry's president, Paul Desmond ("Mr.Desmond"). Desmond Decl. ¶¶ 1, 3 & Exs. A–B. The *Reports* do not typically recommend specific investments. Desmond Decl. ¶ 4; Cripps Dep. at 32–33. Rather, they indicate the relative strength of the stock market, suggesting when the market as a whole is "overbought" or "oversold." Desmond Dep. at 136; 3.10.03 Claassen Decl. ¶¶ 7, 12. The *Reports*, therefore, attempt to predict when assets should be invested in stocks generally, and when they should be moved to other financial instruments. Desmond Decl. ¶ 4; 3.10.03 Claassen Decl. ¶ 7.

The daily *Reports* reflect and analyze market conditions at the close of business the previous day. Desmond Decl. ¶ 4. Lowry's sends them to subscribers by facsimile or email within two or three hours after the market has closed. *Id.* All subscribers thus receive their copy before the market opens the next day. *Id.;* Yoo Decl., Ex. 2. The weekly edition analyzes trends apparent from the entire week's market activity. Desmond Decl. ¶ 4. Lowry's faxes or emails the weekly *Reports* to subscribers on Friday evenings, ensuring receipt prior to the opening of the next week's market. *Id.;* Yoo Decl., Ex. 3.

The "crown jewels" of the *Reports* are the three "Lowry's numbers": figures representing "buying power," "selling pressure," and "short term buying power." Desmond Decl. ¶ 4. The numbers vary from day to day. Lowry's calculates them by using its confidential algorithms. *Id.* In a numeric nutshell, they measure the current flow of money into and out of the stock market. Most significant to investment professionals is the short-term-buying-power figure. *Id.* ¶ 5; 3.10.03 Claassen Decl. ¶¶ 12–13. The predictive power—and so, the value—of the Lowry's numbers allegedly diminishes rapidly. Pl.'s Mot./Opp'n at 34. Numbers a few days old mean little. *Id.*

To protect against disclosure of· still-valuable Lowry's numbers (and other contents of the *Reports* ) to non-subscribers, Lowry's limits subscriptions to individuals. Desmond Decl. ¶ 7. It has never offered institutional subscriptions or group licenses. *Id.* Every subscriber, moreover, must execute a subscription agreement that strictly prohibits unauthorized copying or dissemination of the *Reports* or their contents, including the Lowry's numbers. *Id.* & Exs. D–F.

For more than a decade, Legg Mason has paid for and received a single copy of the daily and weekly *Reports*. Defs.' Statement of Undisputed Facts ¶ 6. Since 1994, that copy has been sent to Linda Olszewski ("Ms.Olszewski"), an employee in Legg Mason's research department at

its Baltimore headquarters. *Id.* Beginning in September 2000, she received her copy from Lowry's by email. Olszewski Dep. at 71. Richard Cripps ("Mr.Cripps"), at all relevant times the director of the research department, formulates and recommends overall investment strategy for Legg Mason brokers. Cripps Dep. at 62; Yoo Decl., Ex. 22. Employees in the department perform three essential tasks: they assist Mr. Cripps in formulating strategy, disseminate internal and outside market research to brokers, and respond to brokers' inquiries about that research. Malis Dep. at 105–06; Olszewski Dep. at 108–09; Cripps Dep. at 55, 109.

Each business day, around 9:15 am, shortly before the New York stock market opens, Mr. Cripps or another employee of the research department places a "morning call" to all Legg Mason brokers throughout the United States. 3.10.03 Claassen Decl. ¶ 12; Overstreet Dep. at 92, 133; Olszewski Dep. at 53–55, 135–38, 154–55. The call is broadcast by intercom or similar device. Cripps Dep. at 21–23, 126; 3.10.03 Claassen Decl. ¶ 12. It provides brokers various up-to-date information about the stock market. Perhaps for as long as Legg Mason received the *Reports,* it included the Lowry's numbers. Cripps Dep. at 126; Yoo Decl., Ex. 17; 3.10.03 Claassen Decl. ¶ 12; 3.10.03 Parent Decl. ¶ 11. Frequently, brokers also telephoned the research department directly to get the numbers. Olszewski Dep. at 152; Thayer Dep. at 109–10.

From 1994 until July 1999, the research department regularly faxed copies of the complete *Reports* to branch offices, where employees further duplicated and distributed them. 3.10.03 Claassen Decl. ¶ 5; 3.10.03 Parent Decl. ¶ 6; Olszewski Dep. at 123–24. In July 1999, the department began posting every issue of the *Reports* on Legg–Mason's firm-wide intranet. Defs.' Suppl. Answer to Interrog. No. 2. The intranet posting continued into early August 2001. *Id.* From late 1999, additional copies were distributed to every member of the research department—including Mr. Cripps—first on paper, later via email. *Id.* The recipients of these copies used them to prepare for the "morning call" and to respond to brokers' questions by telephone. Olszewski Dep. at 84; Thayer Dep. at 96–97, 109–10.

On June 15, 2000, Lowry's received a telephone call from Joe Beasley ("Mr.Beasley"), a broker in a Florida branch office of Legg Mason. Desmond Decl. ¶ 22. Mr. Beasley told a Lowry's employee that he had seen "Lowry's Report on Legg Mason's int[ra] company system." *Id.;* Defs.' Mot., Ex. 14. On December 1, 2000, Matthew Claassen ("Mr.Claassen"), a former Legg Mason broker, telephoned Lowry's and reported that Legg Mason was posting the *Reports* on its "intranet for all the brokers to see and use." Desmond Decl. ¶ 25. Mr. Desmond, who had not taken the call, told his employees to ask Mr. Claassen, if he telephoned again, to provide more detail in writing. *Id.* Lowry's soon received a letter from Mr. Claassen, dated December 22, 2000, reiterating and elaborating his allegation of a "significant copyright violation" by Legg Mason. Yoo Decl., Ex. 28.

On July 30, 2001, Mr. Desmond telephoned Ms. Olszewski. Desmond Decl. ¶¶ 27–28; Desmond Dep. at 72. During that call, she told him that the daily and weekly *Reports* were being posted on Legg Mason's intranet, and had been for some time. Desmond Decl. ¶ 28; Desmond Dep. at 72. Mr. Desmond protested, warning her that he considered such posting an infringement of Lowry's copyrights. Defs.' Mot., Ex. 17. Ms. Olszewski apologized and promised to remove the *Reports* from the intranet immediately. *Id.;* Desmond Dep. at 158. Later that afternoon,

Lowry's sent a "cease and desist" letter to Legg Mason. Desmond Decl., Ex. J. The letter asked Legg Mason to "immediately cease all unauthorized copying of [the *Reports*]." *Id.* By early August 2001, the *Reports* no longer appeared on Legg Mason's intranet. Defs.' Supp. Answer to Interrog. No. 2.

Nevertheless, through June 19, 2002, Ms. Olszewski continued to email copies of all the *Reports* to the members of the research department. *Id.* Thereafter, and well into July 2002, she emailed them exclusively to Todd Thayer ("Mr.Thayer"), a subordinate employee in the research department. Yoo Decl., Ex. 43.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. In considering a motion for summary judgment, "the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact issue is material if it must be decided to resolve the plaintiff's substantive claim. *Id.* at 248, 106 S.Ct. 2505. The "materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

A dispute about a material fact is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded [factfinder] could

return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences .drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the opponent must bring forth evidence upon which a reasonable fact finder could rely, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

### A. Copyright Infringement

#### 1. Prima Facie Liability

■ To establish copyright infringement, Lowry's must prove: (1) that it owned valid copyrights; and (2) that Legg Mason "encroached upon one of the exclusive rights [those copyrights] conferred." *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir.1994) (citing 17 U.S.C. § 501(a)); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir.1993).

■ Lowry's seeks relief under the Copyright Act only for its *registered* copyrights. Lowry's Mot./Opp'n at 18 n. 7. It does not assert any unregistered copyrights it may own in daily *Reports* prior to March 25, 2002. *Id.* As proof of ownership, Lowry's submits the certificates of copyright registration for all of the *Reports* at issue. Yoo Decl., Ex. 4. Copyright registration certificates constitute *prima facie* evidence of a plaintiff's ownership of valid copyrights. 17 U.S.C. § 410(c); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 688 (4th Cir.1992). Accord-

ingly, the burden shifts to Legg Mason to rebut the statutory presumption of ownership by offering evidence that undermines the validity of the copyrights. *Serv. & Training, Inc.*, 963 F.2d at 688. Legg Mason offers none. Therefore, as a matter of law, Lowry's has established the first element of its claim of copyright infringement.

The Copyright Act vests the copyright owner with the exclusive rights to reproduce and to distribute copies of the copyrighted work. 17 U.S.C. § 106(1), (3). Violation of either right constitutes illegal "copying." *Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1083 (D.Md.1995).

At all relevant times, Legg Mason paid for and received a single authorized copy of the weekly and daily *Reports*. Desmond Decl., Ex. C. Lowry's sent all these *Reports* to Ms. Olszewski at Legg Mason's Baltimore address. *Id.;* Defs.' Statement of Undisputed Facts ¶ 6. Legg Mason has acknowledged that Ms. Olszewski or other employees posted a copy of all registered weekly *Reports* on its firm-wide intranet, between July 1999 and early August 2001. Defs.' Suppl. Answer to Interrog. No. 2. Hundreds of Legg Mason brokers and other employees, at over a hundred Legg Mason offices, accessed or downloaded the intranet-posted *Reports* over 16,000 times. Yoo Decl., Exs. 12–14; Metzger Dep. at 20–22. Legg Mason has further acknowledged that Ms. Olszewski or Mr. Thayer, on instruction from Ms. Olszewski, made and distributed copies (first on paper, later via email) of all registered weekly and daily *Reports* to at least six other members of its research department from late 1999 through June 19, 2002. Defs.' Suppl. Answer to Interrog. No. 2. Finally, between June 20, 2002, and late July 2002, Ms. Olszewski continued to forward an email copy of both weekly and daily *Reports* to Mr. Thayer. Yoo Decl., Ex. 43.

■ Unauthorized electronic transmission of copyrighted text, from the memory of one computer into the memory of another, creates an infringing "copy" under the Copyright Act. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518–19 (9th Cir.1993) (finding that unauthorized transfer of copyrighted material into a computer's random access memory infringed owner's copyrights); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.08[A][1], at 8–122.1 through 8–122.4 (2003) [hereinafter Nimmer]. Accordingly, Lowry's has also established the second element of its claim of copyright infringement—at least against Legg Mason's employees. Legg Mason, however, denies liability for the infringing acts of its employees.

■ Vicarious copyright liability stems from the common-law doctrine of *respondeat superior. A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir.2001). Unlike that doctrine, however, it does not depend on the existence of a master-servant or employer-employee relationship. *Id.; see also Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314, 1325–27 (D.Mass.1994) (discussing the distinction). Vicarious copyright liability extends more broadly. *A & M Records, Inc.*, 239 F.3d at 1022. It reaches any defendant who has the right and ability to supervise the infringing activity and also has an obvious and direct financial interest in exploitation of the copyrighted material. *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir.2002). The copyright owner bears the burden of establishing these two elements. *Id.*

■ There can be no doubt that Legg Mason had the right and ability to supervise its own employees, who infringed Lowry's copyrights at Legg Mason offices, using company equipment, on company

time. Nor can there be any doubt that Legg Mason had an obvious and direct financial interest in the widespread copying: at the very least, its employees' infringement saved it the cost of additional subscriptions to the *Reports*.

Legg Mason asserts, however, that the copying contravened express company policy. It offers in evidence several memoranda from its legal and compliance department. *See, e.g.,* Defs.' Mot., Ex. 10 (undated) ("[I]nformation published within financial periodicals, newspapers, etc. are copyrighted and owned either by the author or the publication and are not available for reproduction or unauthorized use or distribution."); *id.,* Ex. 11 (dated December 9, 1999) ("[A]ny material published by an independent third party is subject to copyright laws and requires appropriate authorization and approval prior to being used .... It is extremely important that these procedures be followed to avoid violating applicable regulatory and Firm standards as well as copyright laws."). Legg Mason further asserts that the copying that occurred after the intranet posting ceased violated its direct order not to "mak[e] or distribut[e] **any copies, in any fashion, of** *Lowry's New York Stock Exchange [Market] Trend Analysis." Id.,* Ex. 18 (dated August 3, 2001).

■ Legg Mason's reliance on company policies and orders is misplaced. The law of copyright *liability* takes no cognizance of a defendant's knowledge or intent. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir.1963). Vicarious liability attaches regardless of either: "An infringer of a copyright copies at [its] peril, and an intent to infringe or knowledge of infringement is not necessary in determining liability." *Morser v. Bengor Prods. Co.,* 283 F.Supp. 926, 928 (S.D.N.Y.1968); *see also Grey Computer,* 910 F.Supp. at 1083. The fact that Legg Mason's employees infringed Lowry's copyrights in contravention of policy or order bears not on Legg Mason's liability, but rather on the amount of statutory and punitive damages and the award of attorneys' fees. *See Morser,* 283 F.Supp. at 928 (finding defendant personally liable for infringement by employees he supervised even though the employees disobeyed his explicit instructions). Accordingly, unless Legg Mason can establish an affirmative defense, it is liable for the infringing conduct of its employees.

### 2. *Affirmative Defenses*

Legg Mason raises three such defenses: equitable estoppel, fair use, and implied license. Provided the relevant facts are undisputed, adjudication of these defenses need not await trial. *See, e.g., Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 567 (S.D.N.Y.1995) (granting summary judgment of infringement, rejecting estoppel defense); *Television Digest, Inc. v. U.S. Tel. Ass'n,* 841 F.Supp. 5, 9 (D.D.C. 1993) (same, rejecting defense of fair use) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)); *SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F.Supp.2d 301, 317–18 (S.D.N.Y.2000) (same, rejecting defense of implied license).

#### a. *Equitable Estoppel*

■ The defense of equitable estoppel is "a drastic remedy and must be applied sparingly." *Keane Dealer Servs., Inc. v. Harts,* 968 F.Supp. 944, 948 (S.D.N.Y. 1997). When applicable, it may bar all relief on a claim. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1041 (Fed.Cir.1992). Analysis "focuses on what the [alleged infringer] has been led to reasonably believe from the [claimant's] conduct." *Id.* at 1034.

To establish an estoppel defense, Legg Mason must show that: (1) Lowry's knew or should have known that Legg Mason was infringing its copyrights; (2) Lowry's, through misrepresentation or concealment, induced Legg Mason to reasonably believe that Lowry's did not intend to enforce its rights; (3) Legg Mason was ignorant of the true facts; and (4) Legg Mason relied to its detriment on Lowry's misleading conduct. *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992); *see also United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir.1988).

Legg Mason identifies no overt, affirmative misrepresentation by Lowry's. It claims only that Lowry's too long stood silent and inactive after learning of the infringing intranet postings, whether from Mr. Beasley, in June 2000, or from Mr. Claassen, in December 2000. Although silence and inaction may sufficiently mislead as to raise an estoppel, such passive holding out rarely suffices in cases of statutory infringement. 4 Nimmer § 13.07, at 13–281. "The mere affixation of the copyright notice on copies of the work, if seen by the defendant," speaks loudly and clearly enough "to counter an estoppel based upon a passive holding out." *Id.; see, e.g., Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.1960). Legg Mason does not dispute that each and every issue of the *Reports* displayed a copyright notice in strict accordance with statutory requirements. Moreover, on September 29, 2000, just a few months after Mr. Beasley's telephone call, Lowry's mailed a separate memorandum to all subscribers, including Ms. Olszewski at Legg Mason, reminding them that they were not permitted **"to reproduce all or part of [Lowry's] publications or their contents by any means,"** including "forwarding them to associates, branch offices, affiliates and others without [Lowry's] permission."

Desmond Decl., Ex. H. Lowry's, therefore, did not mislead by silence or inaction.

Legg Mason, moreover, charged with such repeated and unambiguous notice, could easily have ascertained what it could and could not do by making inquiry of Lowry's. Until July 30, 2001, Legg Mason failed to do so. Even thereafter, it continued to infringe. Equitable estoppel is an *equitable* remedy. The party asserting estoppel must "use due care and not fail to inquire as to its rights where that would be the prudent course of conduct." *Keane Dealer Servs., Inc.*, 968 F.Supp. at 948. Accordingly, Legg Mason's estoppel defense must fail.

b. *Fair Use*

■ The Copyright Act provides an explicit exception to the copyright owner's exclusive rights: "the fair use of a copyrighted work ... is not an infringement of copyright." 17 U.S.C. § 107. Fair use is an equitable rule of reason that defies general definition. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 202 (4th Cir.1998). The Copyright Act offers four factors to guide the determination whether a particular use is fair: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These factors are not exclusive, nor may they be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v.*

*Acuff–Rose Music, Inc.,* 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

Legg Mason does not argue that the posting and massive downloading of complete copies of the *Reports* via its intranet constitute fair use. Nor would such an argument prevail. Rather, it invokes the defense only for the more limited paper- and email-copying within its research department. This latter copying occurred in two phases. From late 1999 through June 19, 2002, copies were distributed to all six or more members of the department. Defs.' Suppl. Answer to Interrog. No. 2; Thayer Dep. at 96–97. From June 20, 2002, well into July 2002, Ms. Olszewski emailed a single copy to Mr. Thayer, who then "print[ed] it" on paper. Yoo Decl., Ex. 43; Olszewski Dep. at 70–73. The Court examines each phase in turn.

#### i. *First Phase*

■ The first statutory factor, "the purpose and character of the use," weighs heavily against Legg Mason. The use of a copyrighted work for a commercial purpose militates against a finding of fair use. *Harper & Row, Publishers, Inc.,* 471 U.S. at 562, 105 S.Ct. 2218. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Id.*

None of the members of the research department had any personal interest in the *Reports.* All of them used the copies they received solely to prepare for the "morning call" and to field daily inquiries from Legg Mason brokers about market conditions. Olszewski Dep. at 84; Thayer Dep. at 96–97, 109–10. Their use thus exploited the *Reports* for the commercial benefit of Legg Mason, at the price of a single subscription.

The second factor, "the nature of the copyrighted work," also weighs against Legg Mason, albeit less heavily. Lowry's *Reports* are short newsletters, each rarely exceeding four printed pages. *See, e.g.,* Desmond Decl., Exs. A–B. The annual subscription rate of $700 rather limits their circulation. *See* Desmond Decl. ¶¶ 7, 16. Generally, as Congress recognized, "the scope of the fair use doctrine should be considerably narrower in the case of newsletters than in that of either mass-circulation periodicals or scientific journals," in part because "newsletters are particularly vulnerable to mass photocopying, and ... most newsletters have fairly modest circulations." H.R. No. 94–1476 at 73 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687.

On the other hand, the *Reports* are works of nonfiction, replete with uncopyrightable facts. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 359, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("[T]he facts contained in existing works may be freely copied because copyright protects only the elements that owe their origin to the compiler—the selection, coordination, and arrangement of facts."). And fictional expression falls closer to the core of copyright than nonfictional expression. *Harper & Row, Publishers, Inc.,* 471 U.S. at 563, 105 S.Ct. 2218; *Bond v. Blum,* 317 F.3d 385, 395 (4th Cir.2003).

The third factor, "the amount and substantiality of the portion used," weighs more heavily against Legg Mason. Generally, "as the amount of the copyrighted material that is used increases, the likelihood that the use will constitute a 'fair use' decreases." *Bond,* 317 F.3d at 396. Nevertheless, the "extent of permissible copying varies with the purpose and character of the use." *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164. Copying an entire work weighs against, but does not preclude, a

finding of fair use. *Sundeman,* 142 F.3d at 205.

Legg Mason concedes that the copies distributed to the research department reproduced the *Reports* in their entirety. Moreover, as already determined, the employees of the research department used the copies to advance the business of Legg Mason without due payment to Lowry's.

Finally, the fourth factor, "the effect of the use upon the potential market," also weighs heavily against Legg Mason. This factor is "undoubtedly the single most important element of fair use," *Harper & Row, Publishers, Inc.,* 471 U.S. at 566, 105 S.Ct. 2218, because "it touches most closely upon the [copyright owner's] ability to capture the fruits of [its] labor and hence [its] incentive to create," *Bond,* 317 F.3d at 396. Analysis comprehends a dual inquiry: whether the alleged infringer's use would materially impair the marketability of the work, and whether the infringing work would act as a market substitute for the original. *Bond,* 317 F.3d at 396.

In the instant case, the two inquiries merge. To the extent the six or more copies represented additional, potential subscriptions, the copying within the research department diminished Lowry's market. *See Television Digest, Inc.,* 841 F.Supp. at 10–11 (finding that a trade association's internal distribution of even a few unauthorized copies of a daily newsletter "negatively affected" the copyright owner's market). A use that supplants any part of the normal market for a copyrighted work cannot ordinarily be deemed fair. *Harper & Row, Publishers, Inc.,* 471 U.S. at 568, 105 S.Ct. 2218. Furthermore, the copies made and used by members of the research department were perfect clones of Ms. Olszewski's single subscription copy. They substituted for additional subscription copies, whose cost Legg Mason thereby avoided.

All factors considered, the copying inside the research department between late 1999 and June 19, 2002, does not constitute fair use.

### ii. *Second Phase*

██ After June 19, 2002, Ms. Olszewski no longer emailed copies of the *Reports* to the entire research department. Olszewski Dep. at 73. Instead, she emailed a copy only to Mr. Thayer, who then "print[ed] it" out. *Id.* at 71. From this meager evidence, Legg Mason would infer that Mr. Thayer "print[ed]" but a single copy, which he returned to Ms. Olszewski, and which underwent no further replication. This copying, Legg Mason thus contends, had no impact on the marketability of the *Reports:* Lowry's lost not a single subscriber because Mr. Thayer merely acted as Ms. Olszewski's "secretary"—making a paper copy at the behest, and for the use, of his "boss," who could "fairly" have made the copy herself. From the same evidence, however, Lowry's would infer that Mr. Thayer "print[ed]" out several copies of the *Reports,* which he distributed to the other members of the research department, who used them as they had used their earlier infringing email- or paper-copies.

A reasonable factfinder could draw either inference. Accordingly, with respect to this final phase of copying, summary judgment of infringement is inappropriate. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### c. *Implied License*

██ An implied nonexclusive license to reproduce copyrighted material may be granted orally or implied from conduct. *Nelson–Salabes, Inc.,* 284 F.3d at 514. Such an implied license, a species of contract implied in fact, does not transfer ownership of the copyright; rather, it

simply permits the use of the copyrighted work in a particular manner. *Id.* While federal copyright law recognizes an implied license from the parties' course of dealing, state contract law determines its existence and scope. *Bartsch v. Metro-Goldwyn–Mayer, Inc.*, 391 F.2d 150, 153–54 (2d Cir.1968); *In re Valley Media, Inc.*, 279 B.R. 105, 144 (Bankr.D.Del.2002). Here, either Maryland or Florida law applies.

■■■ Choice-of-law analysis becomes necessary, however, only if the relevant laws of the different states lead to different outcomes. *See Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985) ("Conflicts rules are appealed to only when a difference in law will make a difference to the outcome."). Because the laws of Maryland and Florida do not so conflict, the choice is immaterial, and the law of the forum—Maryland—governs.

■■■■ Under Maryland law, a contract implied in fact is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the *ordinary course of dealing* and ... common understanding." [1] *County Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600 (2000). Necessarily, it requires a manifestation of mutual assent sufficiently definite to assure that the parties are truly agreed with respect to all material terms. *Mogavero v. Silverstein*, 142 Md.App. 259, 277, 790 A.2d 43 (2002).

■■ As with the defense of fair use, Legg Mason invokes the defense of implied license not for the intranet-related copying, but only for the paper- and email-copying within its research department. It points to the following undisputed facts:

(1) once, Lowry's sent a copy directly to Mr. Thayer, who had telephoned, been identified either as Ms. Olszewki's "assistant" or a member of Legg Mason's "research department," and complained that the issue in question had not "[gotten] through"; and (2) at least once, Lowry's sent historical data about its numbers—but not copies of any *Reports*—to another member of Legg Mason's research department. Desmond Dep. at 71, 83–87; Thayer Dep. at 84–85; Overstreet Dep. at 77–80.

Mr. Thayer did not request permission to make *any* copies of the issue Lowry's sent him. Nor did he request more than a single copy of a single issue. He asked only that Lowry's make good its alleged subscription agreement with Ms. Olszewski, who, he indicated, had not received her due copy. Moreover, the copy Lowry's sent him, like every copy it sent Ms. Olszewski herself, contained clear notice of copyright. Neither from this isolated telephone call, nor from the occasional provision of historical data, could Lowry's have known that Ms. Olszewski or Mr. Thayer routinely made and distributed copies of the *Reports* to every member of the research department. Therefore, no rational factfinder could conclude that Lowry's and Legg Mason had mutually assented to such a licensing arrangement. *Cf. Keane Dealer Servs., Inc.*, 968 F.Supp. at 947 (stating that a copyright owner's silence, coupled with knowledge of the copying, may give rise to an implied license). The mere transfer of a copyrighted newsletter does not imply a license to engage in copying that newsletter. *See* 17 U.S.C. § 202 ("Transfer of ownership of any material object, including the copy ... in which the work is first fixed, does not of itself convey

---

1. *Accord, Sanchez v. Marseilles Hotel,* 792 So.2d 1287, 1288–89 (Fla. 1st DCA 2001) ("An implied contract is found when the as-

sent of the parties is derived from other circumstances, including their course of dealing or usage of trade or course of performance.").

any rights in the copyrighted work embodied in the object ....."). Accordingly, Legg Mason's defense of implied license fails as a matter of law.[2]

### 3. *Damages*

■■■ As remedy for infringement, the owner of properly registered copyrights may elect to recover either (1) its actual damages plus the infringer's profits, or (2) statutory damages. 17 U.S.C. § 504(a); *see also id.* § 412. Lowry's has not yet made its election. Both parties nevertheless seek partial summary judgment on various issues related to damages. Legg Mason argues that, as a matter of law, Lowry's can recover neither Legg Mason's profits nor enhanced statutory damages for willful infringement. Lowry's argues that, as a matter of law, Legg Mason cannot reduce any statutory damages on the basis of "innocent" infringement.

#### a. *Profits*

The Copyright Act permits a copyright owner to recover not only its actual damages, but also

> any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove [its] deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

*Id.* § 504(b). The burden of apportionment shifts to the infringer, however, only if the copyright owner establishes a causal nexus between the infringing conduct and the infringer's gross revenue. *Walker v. Forbes, Inc.,* 28 F.3d 409, 412 (4th Cir. 1994); *see also Mackie v. Rieser,* 296 F.3d 909, 915 (9th Cir.2002); *On Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (2d Cir.2001).

■■■ In the case of "direct profits," such as result from the sale or performance of copyrighted material, the nexus is obvious. In the case of "indirect profits," the nexus may be too attenuated. The court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits." *Mackie,* 296 F.3d at 915. It may deny recovery if the profits "are only remotely or speculatively attributable to the infringement." *Konor Enters., Inc. v. Eagle Publ'ns, Inc.,* 878 F.2d 138, 141 (4th Cir.1989) (quoting *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 517 (9th Cir. 1985)) (internal quotation marks omitted).

■■■ Legg Mason never distributed infringing copies of the *Reports*—for sale or otherwise—outside Legg Mason. Only its own employees had access to the intranet and intranet-derived copies, and only its research-department employees had access to the email and email-derived copies. Whatever profits, if any, it reaped from its infringing activities, it reaped indirectly.

Legg Mason's current marketing slogan, Lowry's notes, boldly proclaims: "Legg Mason, Inc., has one product: advice"—i.e., financial advice. Yoo Decl., Ex. 30. Legg Mason markets its advice in various ways: by advising investors, buying and selling securities, managing customers' assets, etc. Regardless, Lowry's maintains, its entire gross revenue, $4.63 *billion* dur-

---

**2.** Even if it is assumed that Mr. Thayer printed out only a single copy for Ms. Olszewski during the final phase of copying in the research department, the defense fails. Lowry's once sent Mr. Thayer the copy it owed Ms. Olszewski. It did not thereby agree to permit Ms. Olszewski, whenever she herself received her subscription copy, to email a copy to Mr. Thayer so that he could make another, paper copy for her.

ing the relevant period, derives from that single product. *Id.,* Ex. 31.

An important element of financial advice, whatever the context, is an expectation about the stock market—a phenomenon that Lowry's *Reports* directly address and analyze. Hundreds of Legg Mason's brokers accessed and, it must be assumed at this stage of the proceedings, read and relied upon the intranet-posted *Reports* in advising customers and making investment decisions on their behalf. *See, e.g.,* 3.10.03 Claassen Decl. ¶ 10 ("While [a broker] at Legg Mason, I came to depend on Lowry's [*Reports* ] in my work of managing investment portfolios."); 3.10.03 Parent Decl. ¶ 10 ("I used [the *Reports* ] ... as a regular and meaningful input into my investment decisions while [a broker] at Legg Mason."). Two former Legg Mason brokers have even testified that some *Reports*-influenced decisions they made actually generated revenue in the forms of commissions taken on securities transactions and fees assessed on the growth of customer accounts. 4.8.03 Claassen Decl. ¶ 1; 4.8.03 Parent Decl. ¶¶ 1–2. Thus, Lowry's concludes, Legg Mason's infringing use of the *Reports* not only enhanced the overall quality and value of its one and only product, but also produced concrete corporate profits.

Remarkably, however, Lowry's own expert admitted that he could not say whether a causal link connected the infringement to Legg Mason's profits:

> A. I think ... [the *Reports* are] sufficiently of value that [their use] *should have led* to higher profits.
>
> Q. So you can't say [whether the alleged infringement] actually in Legg Mason's case led to higher profits?
>
> A. *I can't, no.*

Tabell Dep. at 68 (emphasis added). Even if *some* employees made *some* money for Legg Mason *some of the time* from action they took based *in some part* on what they had read in infringing copies of the *Reports,* Lowry's does not pretend that its publications always analyzed the stock market correctly. Accordingly, it is not evident that those same employees or others always made money based on what they had read in the *Reports.*

Moreover, no Legg Mason brokers have testified that *any* of their investment decisions relied exclusively on information gleaned from infringing copies of the *Reports.* Although the *Reports* may have played an "important," "significant," or "meaningful" role in their decision-making, the brokers that read the *Reports* routinely considered "a variety of [other] information" as well. 3.10.03 Claassen Decl. ¶ 10; 3.10.03 Parent Decl. ¶ 10. At least in some instances, they may have made the same investment decisions—generating the same commissions and fees—even if they had not read the *Reports.*

Although it *seems* that some of Legg Mason's profits "should" relate to its infringing use of Lowry's *Reports,* the appearance defies reason. Tabell Dep. at 68. The complex, variable, independent thought processes of hundreds of individual brokers intervene between the copying and any subsequent gain. Lowry's has articulated no more than a speculative correlation. It is utterly implausible that *all* of Legg Mason's profits resulted from its infringing use of the *Reports.* Even the profits of Legg Mason's securities-brokerage business alone, which realized $1.95 billion in gross revenue during the relevant period, *see* Yoo Decl., Ex. 32, cannot plausibly be attributed to the infringement of Lowry's copyrights. Accordingly, Lowry's claim for Legg Mason's profits must fail.

b. *Reduced Statutory Damages for "Innocent" Infringement*

The Copyright Act permits a court to reduce statutory damages to a

mere $200 per infringed work if "the infringer sustains the burden of proving ... that such infringer was not aware and had no reason to believe that [its] acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2). An infringer cannot obtain the reduction, however, if a proper notice of copyright appears on the material allegedly infringed. 17 U.S.C. §§ 401(d), 402(d); *see also Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 123 (2d Cir.2001). Each and every issue of the *Reports* displayed a copyright notice in strict accordance with statutory requirements. Therefore, Legg Mason cannot remit Lowry's statutory damages below $750 per infringed work. *See* 17 U.S.C. § 504(c)(1).

### c. *Enhanced Statutory Damages for "Willful" Infringement*

■ The Copyright Act also permits a court to increase statutory damages to a maximum of $150,000 per infringed work if "the copyright owner sustains the burden of proving ... that infringement was committed willfully." *Id.* § 504(c)(2). In this context, "willfulness" means that the infringer either had actual knowledge that it was infringing the owner's copyrights or acted in reckless disregard of those rights. *Brown v. McCormick*, 87 F.Supp.2d 467, 482 (D.Md.2000). Evidence that the infringed works bore prominent copyright notices supports, but by no means compels, a finding of willfulness. *See Castle Rock Entm't v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260, 267 (S.D.N.Y.1997). The determination hinges on the alleged infringer's state of mind—whether the infringer knew that its particular use violated the owner's copyrights or willfully ignored the possibility.

■ Summary judgment, of course, "is seldom appropriate in cases wherein particular states of mind are decisive elements of a claim or defense." *Miller v. Fed.*

*Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir.1990). This is so because "a party's mental state is inherently a question of fact which turns on credibility." *United States v. Dollar Bank Money Mkt. Account No. 1591768456*, 980 F.2d 233, 240 (3d Cir.1992); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2730, at 7 (3d ed. 1998) ("Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character.").

Three employees, it appears, played significant roles in the development of the infringing intranet site in 1999: Mr. Cripps, Ms. Olszewski, and Glenn Guard ("Mr.Guard"). Guard Dep. at 14–16. Mr. Cripps, then (and now) director of the research department, Legg Mason refers to simply as a "financial strategist." Cripps Dep. at 11, 53; Defs.' Reply/Opp'n at 22. Ms. Olszewski, then an associate vice-president of the research department, Legg Mason dubs a mere "administrative support employee." Olszewski Dep. at 14–15; Yoo Decl., Ex. 35; Defs.' Mot. at 1. Mr. Guard, the parties agree, was a lower-level employee under the (indirect) supervision of Ms. Olszewski. Guard Dep. at 16.

Mr. Guard, who actually created the intranet site, denies that he decided to post the *Reports* there. *Id.* at 17–18. He asserts, moreover, that he doesn't "know who made the decisions on what went on the ... site." *Id.* at 18; *see also id.* at 53–55. Ms. Olszewski cannot "recall" whether she ever told anyone to put the *Reports* on the intranet. *Id.* at 162. She professes ignorance, moreover, not only of the scope of Lowry's copyrights, but even of the copyright notices themselves. Olszewski Dep. at 92–93. Mr. Cripps, who ultimately

approved the creation of the site, *see* Guard Dep. at 16–17, does not know or cannot remember who decided that it should include a copy of the *Reports.* Cripps Dep. at 77. He admits, however, that he knew that the complete *Reports* could be accessed via the intranet. *Id.*

Such mutual denials (or lapses in memory), by the three employees most likely to know, require evaluation by the finder of fact. The Court cannot now determine who knew what. Accordingly, resolution of the issue of willfulness must await trial.

B. *Unfair Competition: Misappropriation of "Hot News"*

■■■■■ The parties agree that the Lowry's numbers themselves are "factual information" or "news." Defs.' Mot. at 12; Pl.'s Mot./Opp'n at 33. Copyright does not subsist in facts, information, or data, however valuable and costly to acquire. *Feist Publ'ns, Inc.,* 499 U.S. at 347–51, 111 S.Ct. 1282. The Copyright Act, therefore, affords Lowry's no remedy either for the intercom-broadcast of the Lowry's numbers during each business day's "morning call," or for any other dissemination of factual information. The Maryland law of unfair competition may—but only if federal law does not preempt it.

The Copyright Act preempts state law if: (1) the work in which state rights are claimed falls "within the subject matter of copyright"; and (2) the state rights are "equivalent to any of the exclusive" federal copyrights. 17 U.S.C. § 301(a); *see also Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 229 (4th Cir.1993).

■■■ The parties do not dispute that the *Reports,* which include the Lowry's numbers, fall within the subject matter of copyright. It is irrelevant that the numbers themselves are uncopyrightable. "Copyrightable material often contains uncopyrightable elements within it, but [the Copyright Act] … bars state-law …

claims with respect to uncopyrightable as well as copyrightable elements." *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 849 (2d Cir.1997); *see also ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1453 (7th Cir.1996). Thus, "[t]he shadow actually cast by the [Copyright] Act's preemption is notably broader than the wing of its protection." *United States ex rel. Berge v. Bd. of Trs.,* 104 F.3d 1453, 1463 (4th Cir.1997).

Lowry's unfair competition claim, therefore, cannot survive unless it adds or substitutes "an extra element that changes the nature of the state law action so that it is *qualitatively* different from a copyright infringement claim." *Id.* (citation and internal quotation marks omitted). Determination of such a difference requires comparison of the two claims. *Rosciszewski,* 1 F.3d at 229.

■■■ Under Maryland law, the tort of unfair competition extends "to all cases of unfair competition in the field of business." *Balt. Bedding Corp. v. Moses,* 182 Md. 229, 236, 34 A.2d 338 (1943); *Elecs. Store, Inc. v. Cellco P'ship,* 127 Md.App. 385, 407, 732 A.2d 980 (1999).

> What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Balt. Bedding Corp.,* 182 Md. at 237, 34 A.2d 338. The tort is limited neither to "passing off" one's own goods as a competitor's nor to "passing off" a competitor's goods as one's own. *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.,* 27 Md. App. 172, 192, 340 A.2d 736 (1975). Instead, the controlling legal principles "are simply the principles of old-fashioned honesty. One … may not reap where anoth-

er has sown nor gather where another has strewn." *Id.* (citation and internal quotation marks omitted).

■ Legg Mason, Lowry's claims, reaped the benefit of the Lowry numbers without paying a fair price. It paid for a single subscription to the *Reports,* extracted the critical numbers immediately upon receipt, then communicated those numbers to its brokers, every business morning, before or near the time the stock market opened. Mr. Cripps (or another employee) allegedly broadcast the numbers, which employees of the research department had copied onto a "crib sheet," over an intercom or similar device. Cripps Dep. at 21–23, 126; Olszewski Dep. at 53–55, 135–38, 154–55; 3.10.03 Claassen Decl. ¶ 12; 3.10.03 Parent Decl. ¶ 11; Yoo Decl., Ex. 17. The broadcast reached *all* of Legg Mason's brokers—not only those at its Baltimore headquarters, but also those at branch offices throughout the United States. Cripps Dep. at 22–23. Thus, Lowry's maintains, Legg Mason unfairly "usurped an entire market of Lowry's subscribers"—brokers who could have obtained the Lowry's numbers fairly only by individual subscription. Pl.'s Statement of Undisputed Facts P19.

The "morning call" broadcast, however, amounts to no more than the unauthorized public performance of (an uncopyrightable excerpt from) the *Reports.* In the case of "literary works," the Copyright Act grants the copyright owner the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4).

"Literary works" encompass not only the plays of Shakespeare, but anything "expressed in words, numbers, or other verbal or numerical symbols or indicia." *Id.* § 101. The *Reports,* therefore, are "literary works" under the law.

To "perform" a work means "to recite [or] render … it, either directly or by means of any device or process." *Id.* The employee who read the Lowry's numbers during the "morning call," therefore, "performed" the *Reports.*

To perform a work "publicly" means either: "to perform … it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered"; or "to transmit or otherwise communicate a performance … of the work to [such] a place … or to the public, by means of any device or process, whether the members of the public capable of receiving the performance … receive it in the same place or in separate places and at the same time or at different times." *Id.* The hundreds of Legg Mason brokers to whom the "morning call" was broadcast represent a limited, but sufficient segment of the public. The performance, moreover, loses nothing of its "public" nature if fewer than all the potential recipients actually tuned in or listened. *See* H.R. 94–1476, at 64–65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5748, 5678 ("[A] performance made available to the public … is "public" even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his [or her] receiving apparatus at the time of the transmission.").

Thus, the "unfair" conduct of which Lowry's complains does not differ qualitatively from conduct that "would infringe one of the exclusive rights" granted by the Copyright Act. *See Rosciszewski,* 1 F.3d at 229. Lowry's specifically characterizes its claim of unfair competition as a "hot news" claim. Compl. ¶¶ 45–49; *see also Int'l News Serv. v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (originating the "hot news" doctrine under federal common law); Rex Y. Fujichaku, *The Misappropriation Doctrine in Cyberspace: Protecting the Commercial Value of "Hot*

*News" Information*, 20 U. Haw. L.Rev. 421, 439–47 (1998) (analyzing the decision); *GAI Audio of N.Y., Inc.*, 27 Md.App. at 189–93, 340 A.2d 736 (recognizing an *International News Service* claim as a species of unfair competition under Maryland common law). Yet none of the "elements" it posits of such a claim describes *behavior* other than reproduction, performance, distribution, or display.

Lowry's suggests that the elements of a "hot news" claim under Maryland law match the elements of such a claim under New York law, as recently articulated by the Second Circuit: (1) the plaintiff generates or gathers factual information at a cost; (2) the value of the information is highly time-sensitive; (3) the defendant's use of the information constitutes free-riding on the plaintiff's costly effort; (4) the defendant directly competes with a product or service offered by the plaintiff; and (5) the ability of other parties to free-ride on the plaintiff's effort would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened. *See Nat'l Basketball Ass'n*, 105 F.3d at 852.

"Free-riding," however, the only element that constitutes a wrongful *act*, seems indistinguishable from the right to reproduce, perform, distribute or display a work. "[F]ree-riding … may be a pejorative description of copying, but it is still copying." Jane C. Ginsburg, *Copyright, Common Law, and Sui Generis Protection of Databases in the United States and Abroad*, 66 U. Cin. L.Rev. 151, 162 (1997). The other elements do not describe any behavior at all. The cost of generating the information, its time-sensitivity, and direct competition between the parties merely define pre-existing conditions; the threat to the plaintiff's business merely identifies a consequence of the act of "free-riding." *See* Nicholas Khadder, Note, *Nat'l Basket-*

*ball Ass'n v. Motorola, Inc.*, 13 Berkeley Tech. L.J. 3, 14–15 (1998).

The Copyright Act may not preempt every state-law claim of unfair competition. Some "hot news" claims may yet survive. *See Feist Publ'ns, Inc.*, 499 U.S. at 354, 111 S.Ct. 1282 (declining to overrule the holding of *International News Service* and hypothesizing that some information generated by one's labor, though not protected by federal copyright, may be protected "in certain circumstances … under a theory of unfair competition") (citation and internal quotation marks omitted); *see also GAI Audio of N.Y., Inc.*, 27 Md.App. at 186–93, 340 A.2d 736 (upholding judgment of unfair competition against distributors of unauthorized copies of musical recordings, then *outside the subject matter* of the Copyright Act, regardless of the time-sensitivity of the music so purloined). Lowry's claim, however, does not. The Copyright Act preempts it.

## C. Contract

Lowry's also seeks a remedy in contract for Legg Mason's conduct. It claims that Ms. Olszewski executed a subscription agreement in 1994, in which she agreed "not to disseminate or furnish to others, including associates, branch offices, or affiliates, the information contained in any reports issued by Lowry's Reports, Inc., without consent." Desmond Decl. ¶ 7 & Exs. D–F. It claims further that Ms. Olszewski had no personal use for the *Reports*, but subscribed as an agent of Legg Mason. Compl. ¶ 37; Pl.'s Statement of Disputed Facts D6.

■ The unique terms of the parties' express subscription agreement, if proved, "establish[ ] a private law governing fair use of the copyrighted works *inter partes*, which makes the claim qualitatively different from a simple copyright case, in which there is no 'private law' defining what is

and is not fair use." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186 F.Supp.2d 592, 594–95 (D.Md.2002). The Copyright Act, therefore, does not preempt Lowry's breach-of-contract claim. Legg Mason argues, however, that Lowry's has produced insufficient evidence of the existence and terms of the subscription agreement.

Lowry's concedes that it does not have the subscription agreement that it claims Ms. Olszewski executed. Pl.'s Resp. to Req. for Admis. No. 2. It avers that it conducted a bona fide, diligent search, but has been unable to find it. *Id.;* Desmond Decl. ¶ 10. Nevertheless, it asserts that it routinely "required every subscription to be in the name of an individual, and required every subscriber to execute a[n identical] subscription agreement." Desmond Decl. ¶ 7 (emphasis omitted). It offers several contemporaneous subscription agreements, executed by others, as evidence of the terms of the "lost" Legg Mason agreement. Desmond Decl., Exs. D–F.

Legg Mason acknowledges that it "received a single copy of the [*Reports* ] as they were published and for which [it] paid the going rate." Defs.' Statement of Undisputed Facts ¶ 6. It further admits that, since 1994, all the *Reports* were sent to Ms. Olszewski. *Id.* Ms. Olszewski cannot remember whether she ever executed a subscription agreement with Lowry's. Olszewski Dep. at 65–66, 68–69. Nevertheless, she does not deny it. *Id.*

■ Ordinarily, the party seeking to enforce a contract must produce the original contract. *See* Fed.R.Evid. 1002 ("To prove the content of a writing, ... the original writing ... is required, except as otherwise provided in these rules or by Act of Congress."). If the original has been lost or destroyed, however, the terms of the contract may be proved by other evidence. Fed.R.Evid. 1004(1). The trier of fact, not the court, ultimately determines whether the original existed and whether the other evidence accurately reflects its terms. Fed.R.Evid. 1008. Nevertheless, the court must first determine whether there is sufficient evidence of good-faith loss or destruction, and whether the proponent has introduced *prima facie* proof of the existence and contents of the original. *Id.; see also* Fed.R.Evid. 104(b).

■ *Prima facie* proof is evidence from which a reasonable factfinder could decide these issues in the proponent's favor, under the applicable burden of proof. In a diversity case, state law establishes that burden. *Aetna Cas. & Sur. Co. v. Wallace & Gale Co. (In re Wallace & Gale Co.)*, 275 B.R. 223, 242 (D.Md.2002). Under Maryland law, the proponent of a lost document has the burden of proving its existence and terms by "clear and positive" evidence.[3] *Barranco v. Kostens*, 189 Md. 94, 98, 54 A.2d 326 (1947).

■ Legg Mason does not contend that Lowry's lost or destroyed the subscription agreement in bad faith. Nor does any evidence so indicate. Rather, Legg Mason's argument rests entirely on the faulty memory of Ms. Olszewski (with respect to the existence of the contract) and its lack of relationship with the subscribers to the other agreements that Lowry's has tendered (with respect to the terms). Its argument fails. Lowry's attested business practice, Legg Mason's annual payment to Lowry's, the identity of the *Reports'* Legg Mason addressee, and the uniform language of the other subscription agreements would permit a rea-

3. It is not certain whether this standard matches either the mere preponderance standard or the higher "clear and convincing" standard; it may fall somewhere in between.

*See In re Wallace & Gale Co.*, 275 B.R. at 230 n. 6. For the present, the Court assumes it corresponds to the "clear and convincing" standard.

sonable trier of fact to conclude that Ms. Olszewski at some time executed a subscription agreement whose relevant terms matched those of the other agreements. *See* Fed.R.Evid. 406 ("Evidence of . . . the routine practice of an organization, whether corroborated or not . . ., is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice."). Accordingly, Legg Mason is not entitled to summary judgment on Lowry's breach-of-contract claim.

## CONCLUSION

For the foregoing reasons, a separate order will be issued: GRANTING Legg Mason's motion for summary judgment on Lowry's claim of unfair competition, but DENYING that motion on Lowry's claims of copyright infringement and breach of contract; GRANTING Legg Mason's alternative motion for partial summary judgment to foreclose Lowry's claim for Legg Mason's profits, but DENYING that motion on the issue of enhanced statutory damages for willful infringement; GRANTING Lowry's motion for partial summary judgment on Legg Mason's liability for copyright infringement for conduct occurring before June 20, 2002; DENYING that motion on liability for copyright infringement for conduct occurring after June 19, 2002; and GRANTING that motion on the issue of reduced statutory damages for "innocent" infringement.